FIFTH DIVISION

No. 1-07-1639



*In re* DESIREE O., a Minor, )
)                    Appeal from the
        Respondent-Appellee            )                    Circuit Court of
)                    Cook County
(The People of the State of Illinois,    )
)
        Petitioner-Appellee,             )
)                    No. 03 JA 1137
        v.                                       )
)
Analynn D.,                                 )                    Honorable
)                    Lawrence E. Flood,
        Respondent-Appellee              )                    Judge Presiding.
)
(Migdalia R., Intervenor-Appellant)).    )
)

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Intervenor Migdalia R., the former foster parent and maternal grandmother of Desiree O., a minor, appealed from orders of the circuit court that, first, denied her motion for placement of Desiree, and, later, denied her motion to modify or vacate that judgment. On appeal, Migdalia R. argues that (1) the trial court erroneously balanced the goal of reunification with the natural parent against the best interests of the child; and (2) the trial court's "return home" order was against the manifest weight of the evidence. We affirm the judgment of the trial court.

BACKGROUND

Desiree was born in May 2003. She was hospitalized in July 2003, and medical personnel stated that her injuries were consistent with shaken baby syndrome. She was taken into protective custody, and the State filed a petition for adjudication of wardship. In August 2003, the court appointed the Illinois Department of Children and Family Services (DCFS) as Desiree's temporary custodian, and DCFS placed her with Migdalia R. In March 2004, the court entered an adjudication order, which found that Desiree was abused and neglected, that she had suffered physical abuse, that there existed a substantial risk of injury, and that Desiree was in an injurious environment. Desiree's biological father was named as the perpetrator of the abuse while Desiree was in both his custody and the custody of her mother, Analynn D. The father allegedly confessed to the incident and was convicted of aggravated battery to a minor and sentenced to a six-year prison term. Analynn D. was at home during the incident but stated she was unaware of the shaking.

In June 2004, the court made Desiree a ward of the court, found the father unable and unfit to parent her, and found Analynn D. unable to parent Desiree. The court also entered a permanency order, establishing the goal of Desiree's return home to Analynn D. within 12 months. In May 2005, the permanency goal of return home within 12 months was entered; and in September 2005, the permanency goal of return home within 5 months was entered. Finally, in May 2006, the permanency goal of return home within 5 months was entered. The order noted that Analynn D. had participated in and completed recommended services, that overnight visits had been taking place and had been appropriate, and that Analynn D. had been participating in

Desiree's therapeutic services. At no time during the history of this case was a permanency goal other than return home ever entered by the trial court.

In August 2005, Analynn D. filed her motion for return home, having completed all reunification services requested by DCFS.

Also in August, Migdalia R. filed her motion to intervene, for standing and request for placement, pursuant to section 1-5(2) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-5(2) (West 2004)), and section 2-408 of the Code of Civil Procedure (Code) (735 ILCS 5/2-408 (West 2004)). The motion stated that Desiree was the victim of shaken baby syndrome, which caused obstacles and delays in all areas of development. She was under the care of four physicians and receiving several forms of therapy each week, including physical therapy, occupational therapy, speech therapy and developmental therapy. In her motion, Migdalia R. argued that she provided Desiree with a caring and nurturing home and could continue giving her a higher level of care than she could possibly receive from her mother Analynn D. The trial court granted Migdalia R.'s motion to intervene under section 1-5(2)(b) of the Act.

In November, 2006, the hearings began on Analynn D.'s motion for return home and Migdalia R.'s motion for placement. Over four days, six witnesses testified, namely: Emma Ford, the current case worker; Analynn D.; Migdalia R.; Paul Popernik, the family counselor; Sara White, a social worker and registered nurse; and Dr. Elma Augustine, Analynn D.'s therapist.

The testimony at trial established that Analynn D. successfully completed every service required by DCFS in less than one year and, in addition, received her high school diploma, got her driver's license, held a job throughout the pendency of the case, trained herself in a second career

3

as a medical transcriber, and received training and certification as a certified nurse's assistant. Although she was not required to be in individual therapy, she still attended for her own betterment. She lived in a large, one-bedroom apartment with a living room and a large kitchen area. The furnishings were appropriate for Desiree, and Analynn D. had a lot of special equipment and furniture for Desiree's needs. Moreover, Analynn D. was involved with Desiree's therapy throughout the pendency of the case, transported her to school and therapy sessions, and drove her to Migdalia R.'s house, bringing all of Desiree's special equipment. Analynn D. was granted unsupervised overnight visits with Desiree in September 2005, and there was never an unusual incident. Desiree currently spent six nights per week with her mother.

Caseworker Ford testified that three-year-old Desiree had been in Migdalia R.'s care and custody since she was about three months old and had a strong attachment to Migdalia R. That placement had been deemed safe and appropriate. Desiree also had a strong bond with Analynn D. and knew that she was her mother. Desiree received physical therapy, occupational therapy, developmental therapy and speech therapy, and would likely need those services for a long time. The degree of delay in her cognitive functioning had not yet been determined. Analynn D. disciplined Desiree by redirecting her verbally, and Desiree responded to that quite well. She observed them doing some of the exercises recommended by the therapists, such as stretching, massaging, reaching, crawling, turning, and playing with specialized equipment and manipulative toys. Analynn D. was knowledgeable about the time required for each exercise. If Analynn D. got sick, her brother across the street could assist in caring for Desiree. Analynn D. said that she wanted Migdalia R. to be her backup care plan. Analynn D. took Desiree for regular medical

checkups, and Ford never received any information from any physicians that Analynn D. was not attending to Desiree's medical needs. Furthermore, none of Desiree's teachers or therapists expressed any concerns to Ford regarding Analynn D.'s care of Desiree. Desiree was not missing any therapy sessions, and Analynn D. was involved in her therapy. Analynn D. did not have any contact with Desiree's father, who was in a correctional center. He never contacted Ford to request visitation with Desiree or sent any cards, gifts or letters to Desiree. Ford testified that it was in Desiree's best interest to return home full-time to Analynn D. because the visits were appropriate, Analynn D. could meet Desiree's needs, and they were bonded.

Analynn D. testified that she would maintain contact with Migdalia R. and hoped that she would visit so that Desiree would not lose her strong attachment to her grandmother. Analynn D. had no contact with Desiree's father since 2003 and had no intention of reestablishing a relationship with him. Through parenting classes and seminars, she had educated herself about child abuse, anger and stress management, child behavior, and positive discipline. In her individual therapy with Dr. Augustine, they discussed stress, her relationships with Migdalia R. and Desiree's father, and ways to advocate for Desiree. She felt responsible for Desiree's injury because she was unable to realize that Desiree was being abused, but now was confident that she could take care of Desiree because she had educated herself, had a big support group, and continued to participate in family therapy. She could turn to her father, brother and sister for help in caring for Desiree. She was also able to call Migdalia R. if she needed her help for something, such as caring for Desiree for a long weekend. Analynn D. understood what Desiree needed, felt that Desiree trusted her, and was comfortable advocating for Desiree with the service providers.

When questioned as to her desire for placement of Desiree, Migdalia R. testified that she wanted the court to place Desiree in her home and give her legal authority with respect to Desiree's care. Migdalia R. thought Desiree should be placed with her based on her commitment to Desiree's physical and medical needs and her ability to provide consistent, daily therapeutic activities in addition to Desiree's scheduled therapy sessions. Specifically, Migdalia R. had performed therapeutic activities with Desiree on a four-hour cycle, three times each day, seven days a week, with breaks for naps, playtime and scheduled appointments. The activities included massage, stretching, yoga, crawling exercises, balancing, sitting and standing during play, stimulation of Desiree's mouth to improve speech, singing, developmental play activities with special toys, and water activities. Migdalia R. thought that Analynn D. was not yet mature enough to meet all of Desiree's needs. The trial testimony established that Migdalia R.'s caretaking of and advocacy for Desiree had been exemplary. Migdalia R. stated that she discontinued family therapy with Dr. Augustine when the doctor suggested that God allowed Desiree's injury so that Migdalia R. and Analynn D. could heal their relationship.

Licensed clinical professional counselor Popernik testified that Analynn D. and Migdalia R. were referred to him for therapy to resolve some conflicts. He observed that they had a lack of trust, lack of communication, and difficulty in collaborating for Desiree. He noted a slight difference in their approach in terms of Desiree's care. Migdalia R. was an assertive advocate for Desiree and felt that you had to keep people on their toes, whereas Analynn D. was more respectful and deferential toward Desiree's therapists and service providers and felt like she was being educated by them. Popernik never talked with any of Desiree's therapists and never

observed any of her therapy sessions. He felt Analynn D. and Migdalia R. made progress in terms of better communication with each other. He doubted whether they could develop a collaborative plan together for Desiree's treatment and thought the transition in the role of her primary caregiver from Migdalia R. to Analynn D. had somewhat derailed the collaborative process.

White, a licensed clinical social worker and licensed registered nurse, performed a social work assessment for Migdalia R. in February 2004. She felt that social work services would help Migdalia R. obtain things from the caseworker for Desiree, and also help her relationship with Analynn D. White opined that Migdalia R. provided excellent care to Desiree and that Desiree was happy at her home. White believed Desiree had a strong attachment to Migdalia R. and opined that Desiree would have a "pretty significant attachment" to Analynn D. White did not have any contact with Migdalia R. after May 2006. White did not provide any therapies to Desiree, did not assess her delays or progress, never visited Analynn D.'s home or interviewed her, and never observed Analynn D. with Desiree.

Dr. Augustine, a clinical psychologist, testified that she was impressed by Analynn D.'s strength, intelligence and maturity. Analynn D. accomplished her goals very quickly and made significant progress in therapy. Dr. Augustine explained that, when she is asked for her recommendations about reunification, her assessment is based very heavily on the safety risk for the child, who comes first. She looked at the parent's ability to safely care for and protect the child, and the parent's coping skills, patience, and understanding of the required services for a developmentally challenged child. She believed Analynn D. possessed all those qualities. She observed Analynn D. and Desiree's warm, caring and fun interactions and believed they were very

much bonded. Analynn D. did a very good job of disciplining Desiree, putting her in a time out and discussing it with her. Dr. Augustine also observed Analynn D. doing exercises with Desiree, like stretching her. Dr. Augustine had no concerns or issues about whether Analynn D. would take good care of Desiree.

Dr. Augustine conducted about five family therapy sessions with Analynn D. and Migdalia R. She thought their relationship was characterized by a lot of hurt feelings, past unresolved issues, and some anger, but she could tell that they cared about each other. She stopped providing family therapy after she recommended that Desiree return home, but continued counseling Analynn D. She believed that Analynn D. realized how much Desiree loved her grandmother and would try to keep Migdalia R. involved in Desiree's life. Dr. Augustine believed that it was in Desiree's best interest to be returned to the care and custody of Analynn D.

On January 30, 2007, the trial court granted Analynn D.'s motion for return home and entered a modified disposition order finding her fit, able and willing to care for Desiree. The trial judge took judicial notice of the fact that the goal for Desiree since the inception of the case had been return home to her mother Analynn D. The trial judge noted that Analynn D. had taken responsibility in her own life and had gained the maturity to be a responsible mother for Desiree, who had been spending four to six days a week with Analynn D. and needed to continue to bond with her mother. Further, the trial judge noted that Analynn D. had the capacity to deal with issues concerning Desiree's services and the ability to comply with the requirements of any of Desiree's treatment needs. The judge also noted that Desiree's father was the perpetrator of the abuse and neglect and returned Desiree home under an order of protection, which required, *inter*

*alia*, that Analynn D. ensure that Desiree had no contact with her father. The trial judge acknowledged Migdalia R.'s exemplary work in caring and advocating for Desiree, but noted, citing sections of the Act, that the Act directed the court to act in a just and speedy manner to reunite families when it was in the best interest of the minor and she could be cared for at home without endangering her health or safety.

Also on January 30, 2007, the trial court denied Migdalia R.'s motion for placement and ruled that there was no just reason to delay enforcement or appeal of the order. The trial court also refused Migdalia R.'s request for an order granting her visitation with Desiree and her request to order attendance at family therapy.

On March 1, 2007, Migdalia R. filed a timely motion to vacate or modify the judgment, for rehearing and for other relief, pursuant to sections 2-1203 and 2-1301 of the Code (735 ILCS 5/2-1203, 2-1301 (West 2006)). The motion asked the court to vacate or modify its denial of her request for placement of Desiree and requested a rehearing on the request for placement. The motion argued that the court's ruling was against the manifest weight of the evidence, asserting that it was in Desiree's best interest to remain with Migdalia R. The motion also argued that the mother's right to custody had been allowed to prevail over Desiree's best interest, and that the denial of Migdalia R.'s request for court-ordered visitation and continued participation in family therapy was an abuse of discretion. The trial court denied the motion to vacate on May 15, 2007.

On June 13, 2007, Migdalia R. filed a notice of appeal, specifying that she was appealing the trial court's January 30, 2007, denial of her request for placement, and May 15, 2007, denial of her motion to vacate the judgment dated January 30, 2007.

1-07-1639

On appeal, Migdalia R. asserts that (1) the trial court erred as a matter of law in returning Desiree home to her natural mother, giving undue weight to the goal of reunification of the child with her natural mother and failing to focus on the best interest of the child as the sole criterion guiding the placement decision under the Act; and (2) the trial court's return home order was against the manifest weight of the evidence.

## ANALYSIS

### I. Jurisdiction

First, we address multiple assertions by respondents that we lack jurisdiction to consider this appeal.

Analynn D. argues, *inter alia*, that we lack jurisdiction because Migdalia R.'s appeal from the denial of her request for placement of Desiree is not an appeal of right but, rather, is interlocutory in nature and governed by Supreme Court Rule 306(a)(5) (210 Ill. 2d R. 306(a)(5)).[1] Analynn D. argues, consequently, that Migdalia R.'s petition for leave to appeal, supporting record, and legal memorandum, if any, should have been filed with the appellate court within five business days after the denial of her motion for placement, *i.e.*, within five business days from January 30, 2007. 210 Ill. 2d R. 306(b)(1). Analynn D. adds that Migdalia R.'s

---

[1] Rule 306(a)(5) provides that a party may petition the appellate court for leave to appeal from interlocutory orders of the trial court "affecting the care and custody of unemancipated minors, if the appeal of such orders is not otherwise specifically provided for elsewhere in [the supreme court rules]." 210 Ill. 2d R. 306(a)(5).

10

motion for rehearing from the denial of her motion for placement did not toll the requirement to file the notice of appeal within the time limit outlined in Rule 306. See <u>Law Offices of Jeffery M. Leving, Ltd. v. Cotting</u>, 345 Ill. App. 3d 495, 499 (2003) (a motion for reconsideration directed against an interlocutory order will not toll the running of the deadline for filing an appeal under Supreme Court Rule 306).

We disagree. Migdalia R.'s appeal is not interlocutory in nature. Supreme Court Rule 306A provides for expedited appeal procedures for "orders modifying child custody where a change of custody has been granted." 210 Ill. 2d R. 306A(a)(2). Moreover, the trial court properly ruled that there was no just reason to delay enforcement or appeal of the denial of the motion for placement, because it was a final judgment where Migdalia R.'s standing to present that motion was based on her status as an intervenor. 210 Ill. 2d R. 304.

The State argues that we lack jurisdiction to review Migdalia R.'s arguments regarding the trial court's order returning Desiree home to her mother because Migdalia R.'s notice of appeal stated that she was appealing only from the denials of her motion for placement and motion to vacate. In a similar vein, the Public Guardian argues that we lack jurisdiction because Migdalia R. did not toll the time limit to appeal either the modified disposition order or the return home order by referencing those orders in her motion to modify or vacate.

Specifically, the trial court issued three separate orders on January 30, 2007: (1) a modified dispositional order finding Analynn D. fit, able and willing to parent Desiree; (2) a ruling granting Analynn D.'s motion for return home; and (3) a ruling denying Migdalia R.'s motion for placement and finding no just reason to delay enforcement or appeal of that order.

11

1-07-1639

The filing of a timely motion to vacate a final order tolls the 30-day period for filing the notice of appeal. 210 Ill. 2d R. 303(a)(1). Migdalia R.'s timely motion to vacate, however, asked the court to vacate or modify only its denial of her motion for placement and request for court-ordered visitation and required participation in family therapy. She never asked the trial court to reconsider the order finding that Analynn D. was fit, able and willing to care for Desiree, and never mentioned the trial court's ruling granting the mother's return home motion. Thus, the Public Guardian argues, Migdalia R.'s motion to vacate did not toll the 30-day period to appeal either the modified dispositional order or the order granting Analynn D.'s return home motion.

"The purpose of a notice of appeal is to inform the prevailing party that the unsuccessful party has requested review of the judgment complained of and is seeking relief from it." In re F.S., 347 Ill. App. 3d 55, 68 (2004). Supreme Court Rule 303(b) provides that a notice of appeal "shall specify the judgment or part thereof or other orders appealed from and the relief sought from the reviewing court." 210 Ill. 2d R. 303(b)(2). Because notices of appeal are to be construed liberally (Daniels v. Anderson, 162 Ill. 2d 47, 62 (1994)), the failure to specify a particular order in a notice of appeal does not preclude our review of that order "so long as the order that is specified directly relates back to the judgment or order from which review is sought." Perry v. Minor, 319 Ill. App. 3d 703, 709 (2001). Accordingly, an order that is not specified in the notice of appeal is reviewable if it is a step in the procedural progression leading to the judgment specified in the notice of appeal. Burtell v. First Charter Service Corp., 76 Ill. 2d 427, 435 (1979).

12

In the instant case, the court's modified order finding Analynn D. fit, able and willing to care for Desiree was a step in the procedural progression leading to the judgment to grant Analynn D.'s motion to return Desiree home. Moreover, Analynn D.'s return home motion and Migdalia R.'s motion for placement were merely two sides of the same coin. By challenging the denial of her motion for placement, Migdalia R. informed the prevailing parties that she was appealing the trial court's decision to remove her as Desiree's foster parent and transfer custody to Analynn D. Accordingly, Migdalia R.'s timely motion to vacate and notice of appeal were sufficient to confer jurisdiction upon this court to review her appeal of the trial court's return home order. We note that Migdalia R. never challenges in this appeal the trial court's determination that Analynn D. was fit to care for Desiree.

## II. Reunification and the Child's Best Interests

Migdalia R. contends the trial court erred as a matter of law by considering the goal of reunification with the natural parent instead of focusing on Desiree's best interest as the sole criterion guiding its placement decision. Migdalia R. acknowledges that return home to the natural parent is a goal specifically stated in the Act, but argues that if it can be shown that another placement for the child is in the child's best interests and specific reasons can be identified in support, then that must prevail despite the natural parent's successful completion of all the services and tasks required by DCFS. To support this assertion, Migdalia R. cites specific provisions concerning the purpose and policy of the Act, namely, that every child has a right to services necessary to her safety and proper development (705 ILCS 405/1-2(3)(b) (West 2006)), and that "[t]he parents' right to the custody of their child shall not prevail when the court

13

determines that it is contrary to the health, safety, and best interests of the child" (705 ILCS 405/1-2(3)(c) (West 2006)). Moreover, Migdalia R. cites the prefatory language of the *best interest* definition within the Act (705 ILCS 405/1-3(4.05) (West 2006)), which requires the court to consider the listed factors in the context of the child's age and developmental needs. Migdalia R. asserts that Desiree's developmental needs were best served by maintaining her placement with Migdalia R., even though Analynn D. did everything required of her by DCFS.

We set forth the relevant provisions of the Act that created the framework the trial court applied in the present case. Once a trial court adjudicates a child abused and neglected, the court maintains jurisdiction over the case to conduct a dispositional hearing, where the court determines whether the parent is fit, willing and able to parent the child. 705 ILCS 405/2-21, 2-22 (West 2006). After disposition, the court maintains jurisdiction and may modify the dispositional order, consistently with section 2-28 of the Act, at any time until the case is finally closed or the child reaches majority. 705 ILCS 405/2-23(2) (West 2006). Section 2-28 provides that anyone interested in the child may petition the court for a change in custody or for the restoration of the child to her parents. 705 ILCS 405/2-28 (West 2006). If the minor has been found to be neglected or abused, the court can restore custody to the parent only if the minor can be cared for at home without endangering her health or safety, and if it is in the child's best interest. 705 ILCS 405/2-28(4) (West 2006). The court must enter an order finding the parent fit to care for the minor before custody can be restored. The provisions of section 2-28(4) concerning the restoration of custody to the parent are premised on a permanency goal of return home.

Migdalia R. intervened in this action pursuant to section 1-5(2)(b) of the Act, which tracks the provisions of section 2-28(4). 705 ILCS 405/1-5(2)(b) (West 2006). Section 1-5(2)(b)

14

provides that if, after an adjudication of abuse or neglect, a motion is made to restore custody to a parent, the current foster parent may intervene for the sole purpose of requesting continued placement of the child with that foster parent. In re A.L., 294 Ill. App. 3d 441, 448 (1998). However, nothing in section 1-5(2) "shall relieve the court of its responsibility, under Section 2-14(a) of this Act to act in a just and speedy manner to reunify families where it is in the best interests of the minor and the child can be cared for at home without endangering the child's health or safety." 705 ILCS 405/1-5(2)(b) (West 2006).

Section 2-14(a) provides that the State should act in a just and speedy manner to determine a child's best interest, "including providing for the safety of the minor, *** reunifying families where the minor can be cared for at home without endangering the minor's health or safety and it is in the best interests of the minor, and, if reunification is not consistent with the health, safety and best interests of the minor, finding another permanent home for the minor." 705 ILCS 405/2-14 (West 2006).

The health, safety and interests of the minor remain the guiding principle when issuing an order of disposition regarding the custody and guardianship of a minor ward. In re Austin W., 214 Ill. 2d 31, 46 (2005). The best interest of the child is the paramount consideration to which no other takes precedence. In re Austin W., 214 Ill. 2d at 46. In making a best-interests determination, courts consider the following factors in the context of the child's age and developmental needs: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's

community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures, siblings and other relatives; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2006).

Other important considerations include the nature and length of the child's relationship with the present caretaker and the effect that a change of placement would have upon the emotional and psychological well-being of the child. In re Austin W., 214 Ill. 2d at 50. No single factor, however, is dispositive. In re Austin W., 214 Ill. 2d at 50.

> "Courts must remain ever mindful that 'the overriding purpose of
> the Act to which all other goals are subordinate is the best interest
> of the child involved.' [Citation.] Even the superior right of a
> natural parent must yield unless it is in accord with the best interests
> of the child. [Citations.] Under certain circumstances 'it is not
> necessary that the natural parent be found unfit or be found to have
> legally forfeited his rights to custody, if it is in the best interest of
> the child that he be placed in the custody of someone other than the
> natural parent.' [Citation]." In re Austin W., 214 Ill. 2d at 50-51.

To support her contention that the trial court improperly balanced the mother's interest in regaining custody against Desiree's health, safety or best interest, Migdalia R. points to the following statement in the trial court's nine-page ruling read from the bench:

> "Now taking all that into consideration, and taking a look at
> the best interest criteria under the Juvenile Court Act for the child,

the [A]ct certainly balances in favor of looking towards first the return home of the child to the family. But in making that determination, I have to take into consideration the best interest factor, and coupling those best interest factors with [the] uniqueness of every family. I can't just put this ideal family situation and balance that criteria against that. I have to look at the dynamics of each and every family."

Reviewing that statement in the context of the entire ruling, however, the record is clear that the trial court did not give undue weight to the fact that Desiree's natural mother sought a change in custody. Rather, the trial court noted the general goal of reunification stated throughout the Act and the specific procedural posture of this case, where the permanency goal had always been return home to Analynn D. The trial court was adjudicating the mother's motion for return home under section 2-28(4) of the Act, where the issue was whether Desiree could be cared for by her mother without endangering her health or safety, and whether it was in Desiree's best interest to be returned home. The trial court rejected any assertion that the best interest consideration meant comparing caretaker skills to determine which person more closely met some ideal standard. The trial court properly utilized the best interest factors set forth in the Act and considered the uniqueness and dynamics of this particular family to determine whether reunification with Analynn D. was in Desiree's best interest.

The trial court's oral ruling establishes that it was aware of its duty to consider Desiree's health, safety and best interest, first and foremost, in the context of ruling on the mother's motion. The trial court did not improperly accord weight to Analynn D.'s interest in regaining custody of

her daughter. Rather, the trial court determined that reunification with her natural mother was in Desiree's best interest and could be accomplished consistently with her health, safety and best interest. That distinction is crucial. Specific stages of proceedings under the Act focus on different issues. Here, the issue was not which permanency goal was in Desiree's best interest, but whether the accomplishment of the return home goal, which had previously been identified as being in her best interest, could be achieved consistently with her health, safety and best interest. The trial court correctly applied the relevant provisions of the Act in granting Analynn D.'s motion for return home and denying Migdalia R.'s motion for placement.

### III. Return Home Order

Next, Migdalia R. contends the trial court's ruling on Analynn D.'s motion for return home was against the manifest weight of the evidence. She asserts the trial court ignored evidence that Desiree's special needs as a disabled child would be better satisfied if she remained in Migdalia R.'s care. Migdalia R. argues that she cared for and had custody of Desiree for most of her life, ever since she was hospitalized after she had been shaken by her father. Caseworker Ford testified that Desiree would likely need physical, occupational and speech therapy for the rest of her life, and Migdalia R. argues that she supported Desiree 24 hours a day, 7 days a week with a consistent regimen of therapeutic activities and exercise at home. Migdalia R. argues she has been more involved with Desiree's medical and therapeutic needs than Analynn D. and asserts that her house was the least disruptive alternative for Desiree. Moreover, Popernik, the family therapist, described Migdalia R. as an assertive advocate for Desiree whereas Analynn D. seemed more accommodating or deferential to Desiree's health and service providers.

1-07-1639

The proper standard of proof applicable to the trial court's best interests determination in the context of a proceeding to modify a dispositional order regarding custody and guardianship is the preponderance of the evidence standard. In re Austin W., 214 Ill. 2d at 51. The best-interests determination is then reviewed under the manifest weight of the evidence standard. In re Austin W., 214 Ill. 2d at 51-52. A judgment is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent. In re C.N., 196 Ill. 2d 181, 208 (2001).

We find that the trial court's judgment regarding the best interests of Desiree is supported by the manifest weight of the evidence. The evidence established that Desiree's health and safety were not endangered by returning home to her mother, where Desiree already had been spending six nights a week at her mother's home without incident. Morever, no evidence established that Desiree lost ground in therapy when she started having overnight visits with her mother, or that she started to miss medical appointments at that time. Analynn D. lived in a large, one-bedroom apartment and had a lot of therapeutic equipment for Desiree's special needs. Analynn D. arranged her work schedule so that she would be home when Desiree was not in school. Moreover, Analynn D. was involved with Desiree's therapy, transported her to school and therapy sessions, and drove her to Migdalia's R.'s house, bringing all the special equipment so that Desiree was never without what she needed. Analynn D. testified that she felt responsible for what had happened to Desiree and had educated herself about child abuse. She stated that she was ready to take complete responsibility for Desiree and had a support system in place if she needed assistance.

Other than Migdalia R., none of the witnesses testified in support of her position that Desiree's return home to her mother was not in Desiree's best interest. On the contrary,

19

caseworker Ford and Dr. Augustine opined that Desiree's best interests would clearly be served by her return home to her mother. Although Desiree had bonded with her grandmother, Desiree knew that Analynn D. was her mother and had a strong bond with her. Ford and Dr. Augustine, who had both observed Desiree and Analynn D. together during many visits, believed that Analynn D. was ready to assume full-time responsibility for Desiree. Dr. Augustine noted that Desiree and Analynn D.'s interaction was warm and caring and found Analynn D. fully capable of caring for Desiree safely.

The trial court found that Desiree needed to continue that strong bond with her mother, who had proved she now had the maturity and skills to care for Desiree and attend to her special needs. The trial court acknowledged Migdalia R.'s commitment to Desiree, their bond, and the excellent care she had provided. The court also recognized the strained relationship between Migdalia R. and Analynn D., noting that their stubbornness contributed to their determination to help Desiree but detracted from their ability to cooperate with each other. The trial court noted Analynn D.'s unwavering commitment to Desiree, intention to keep her door open to visits by Migdalia R., and hope that Desiree would keep her close relationship with her grandmother.

The trial court's determination that Desiree's safety, health and best interest were consistent with a return home to Analynn D. was not against the manifest weight of the evidence. Moreover, there was no evidence to indicate that Analynn D. would exclude Migdalia R. or interfere with Desiree's attachment to her grandmother. The trial court appropriately granted the motion by Analynn D. for Desiree to return home.

CONCLUSION

For the reasons explained above, we affirm the judgment of the circuit court of Cook

1-07-1639

County.

Affirmed.

FITZGERALD SMITH, P.J., and GALLAGHER, J., concur.

1-07-1639

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
(Front Sheet to be Attached to Each Case)


*In re* DESIREE O., a Minor,

Respondent-Appellee

(The People of the State of Illinois,

Petitioner-Appellee,

v.

Analynn D.,

Respondent-Appellee

(Migdalia R., Intervenor-Appellant)).


No. 1-07-1639

Appellate Court of Illinois
First District, FIFTH DIVISION

March 21, 2008


Justice Margaret O'Mara Frossard authored the opinion of the court:

Presiding Justice Fitzgerald Smith and Justice Gallagher concur.


Appeal from the Circuit Court of Cook County.
The Hon. Lawrence E. Flood, Judge Presiding.


**COUNSEL FOR INTERVENOR-APPELLANT**
James K. Leven, Chicago, IL 60601

**COUNSEL FOR MINOR-RESPONDENT-APPELLEE**

1-07-1639

Robert F. Harris, Cook County Public Guardian, Chicago, IL 60612
OF COUNSEL: Kass A. Plain and Jean M. Agathen

**COUNSEL FOR PETITIONER-APPELLEE**
Richard A. Devine, Cook County State's Attorney, Chicago, IL 60602
OF COUNSEL: James E. Fitzgerald, Mary Needham and Jennifer Streeter

**COUNSEL FOR RESPONDENT-APPELLEE**
Marv Raidbard, Chicago, IL  60604

(USE REVERSE SIDE IF NEEDED)