2026 IL App (1st) 251877-U

SECOND DIVISION
June 25, 2026

No. 1-25-1877

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| | ) | |
| IN THE INTEREST OF O.N. AND C.N., | ) | Appeal from the |
| | ) | Circuit Court of |
| Minors-Respondents-Appellees, | ) | Cook County |
| | ) | |
| (PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | 21 JA 00743 |
| V.G., | ) | 22 JA 00720 |
| | ) | |
| Mother-Respondent, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| J.T., | ) | Honorable |
| | ) | Tracie Porter, |
| Father-Respondent-Appellant.) | ) | Judge Presiding |
| | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Van Tine and Justice D.B. Walker concurred in the judgment.

**ORDER**

¶ 1     *Held*: Affirmed. Court's decision to return children who had been adjudicated abused and neglected to mother instead of father was not against manifest weight of evidence.

¶ 2     This is the rare case involving abuse and neglect of children that has a relatively happy

ending. After their children were adjudicated neglected and abused and made wards of the court, the parents ("Mother" and "Father" for anonymity), who were not living together, worked on the problems that led to the children's removal in the first place. Their work paid off; both parents successfully completed the required programs and therapy, found stable work and living conditions, and eventually were granted unsupervised visitation time with their children. Each parent filed a separate motion to return the children home to their respective custody.

¶ 3     After a dispositional hearing where the court heard extensive evidence of both parents' progress, the court chose to return the children to Mother's home. Father appeals. Though we congratulate Father on doing the hard work to restore his relationship with his children, we cannot say that the court's ruling—that the children's best interests were served by granting Mother residential custody—was against the manifest weight of the evidence. We thus affirm.

¶ 4                                    BACKGROUND

¶ 5     The children at issue, whom we call "Son" and "Daughter," are the only children born to Mother and Father. Mother has other children as well. Son was born in July 2021, while Daughter was born in August 2022.

¶ 6     In August 2021 (as to Son) and September 2022 (as to Daughter), the State filed petitions for adjudication of wardship, alleging that each child was abused and anticipatorily neglected. The allegations stemmed from an incident where Mother allegedly locked one of her other children in her bedroom and did not return to the house until the next day. The child had to break the bedroom door open to feed herself and use the bathroom. The petition also alleged that Mother hit one of her other children with a baseball bat during an argument, which resulted in a broken finger and several bruises. Finally, the State alleged a history of domestic violence between Father and Mother.

¶ 7    By Spring of 2023, each parent had progressed in their services to earn unsupervised day visits. In May 2024, the court found that Son was neglected because he had been exposed to an injurious environment and abused because he was placed at a substantial risk of injury. A few months later, in August 2024, the court found that Daughter was neglected because she was exposed to an environment injurious to her welfare.

¶ 8    At the dispositional hearing that followed, the court found that both Mother and Father were unable to care for Son and Daughter and placed the children in the custody of the Department of Family and Children's Services (DCFS) guardianship administrator. (The children, along with three others that were Mother's but not Father's, had already been placed in temporary foster care.) At the time, the agency servicing both children did not recommend the children be returned to either parent, but the court entered a permanency goal to return both Son and Daughter home in the next five months.

¶ 9    Since the beginning of the case, both Father and Mother worked on the problems that led to DCFS intervention. By all accounts, they succeeded: as noted, in early 2023 the court allowed both parents unsupervised day visits with Son and Daughter, which later became unsupervised overnight visits, though the orders specified that the parents not visit the children at the same time. The record is clear that both children bonded with their parents. There appeared to be no issues with either Mother or Father during these unsupervised visits; the case workers had only positive observations. And Son and Daughter were spending time with Mother's other children, who were engaged with and growing closer to their young siblings.

¶ 10    Both parents had been referred to complete various services, and both were engaged and attentive to those recommendations. For example, Mother and Father each attended individual therapy and eventually completed various parenting and domestic violence classes. Both parents

also found housing and employment, though there were occasional struggles to keep both.

¶ 11    In January 2025, the court noted that both parents had made significant progress. According to all reports, Mother had completed her required services, including a parent capacity assessment, and was engaged in individual therapy. She also had procured stable housing and was employed. Father, meanwhile, had completed his parenting classes, a substance abuse assessment, and domestic violence services. He also was in individual therapy sessions and had been referred for an anger management assessment. Father was employed and had housing, though he was struggling to keep up with his monthly rent. He eventually found stable housing and continued to work full-time as a security guard at a high school. Mother, meanwhile, was living with her parents and was helping take care of them while also looking for work.

¶ 12    That same month, both parents filed a motion asking the court to return the children home. By that point, both children were spending multiple days and overnights with each parent separately. They spent Sunday evening through Tuesday morning with Father, and with the exception of one day with a foster parent, the other days and nights with Mother. All the time spent with Mother and Father was unsupervised, with no report of any problems.

¶ 13    The court held an evidentiary hearing on July 1, 2025, on both parents' motions to return home, where it heard testimony from several people and reviewed documents offered by the parties as evidence. We summarize the relevant details.

¶ 14    Yomaecka Tordecilla, a case worker from One Family Illinois, the agency working with Son and two of his half-siblings, first testified. She told the court that Mother had completed all the recommended reunification services, that the family did not need further services, and that the parents had been having unsupervised day and overnight visits with the children. Mother had been regularly having up to four days a week of unsupervised day and overnight visits with the

two children she had with Father as well as one of her other children. Tordecilla had "no concerns" with how those visits went and said that the children were "all happy with being with mom and staying with mom."

¶ 15     At the time, Mother was living with her mother ("Grandmother"). The home was appropriate and passed all necessary checks. When Tordecilla visited the children there, she had no concerns and believed that the children were bonding well with Grandmother.

¶ 16     Tordecilla recommended that the children be returned home with Mother. She said that Mother "has been very attentive to all the children's needs. Each child individually told her that "they love their mother" and "want to stay with their mother."

¶ 17     Martina Richardson, a DCFS case worker assigned to Daughter's case, said that Daughter was doing well; she did not need any special services, was engaging in play therapy, and had no issues with either parent. In her mother's presence, Daughter seemed "very comfortable and happy," and when DCFS investigated Mother's home, the agency found no issues. The same was true of Daughter's visits with Father: she seemed comfortable with him; his behavior and interactions with her were appropriate. Both parents had completed unification services and did not need more services. And the children's foster parents did not report any issues when the children returned after visits with either parent.

¶ 18     All that said, Richardson said the agency recommended Daughter be returned home to mother. She said the agency believed "that [Daughter] should be in the same home with her siblings. We believe mom has completed all her services. She acknowledged why this case came in. She has actually repaired *** her relationship with [her older daughter, who had the most exposure to the previous domestic violence]. And they are doing well. And we also believe it is best for the children to stay together with mom just so they can build that foundation and build

that relationship with their siblings and mom together." In the two years that Richardson was assigned the case, Mother was "calm" and "nurturing" toward Daughter and had bonded with her well. The agency had no concerns about returning Daughter to Mother's care, and Richardson recommended the visitation schedule with Father remain the same.

¶ 19    Alexandrea Durham, a caseworker with DCFS who was assigned Daughter's case, reiterated what was becoming clear: that both parents were doing well, acting appropriately, and that Daughter was bonding with them both. When Durham made unannounced visits to both parents' homes separately, she found them safe and appropriate for the children. Durham's recommendation was the same as Tordecilla's: Daughter should be returned to Mother's care because she would be living with her other siblings, along with her grandparents.

¶ 20    At the time of the hearing, Mother was applying for a program from the State that would allow her to be paid to take care of her parents instead of placing them in a nursing home, meaning Mother would have a steady stream of income to support the family. Durham also noted that, while Mother was working at home caring for the grandparents, she would also be able to provide Daughter with regular support. The only concern was that Mother's residence was a little small to house four children, Mother, and Mother's parents, but DCFS had no issue with the children sharing a bedroom since they were related.

¶ 21    Father also testified at the hearing. He told the court that, other than Son and Daughter, he lived alone. He was working full-time as a security guard at a local high school and had secured a two-bedroom home. He visited with the children regularly, picking them up on Sunday afternoon and staying with them until Tuesday afternoon, and there had been no incidents since he began unsupervised visits with them. When asked what he would do if the children were returned to him, he said he would be able to provide all the necessary care and support for them,

that they would attend a daycare next to his workplace during the day, then return home to him at night. Father also said that he would want Mother to be able to visit with the children every other weekend, which would have changed the then-existing visitation schedule.

¶ 22    The court agreed with the recommendation of the GAL that the children return home to Mother. The court found itself in "a very difficult situation to be put in with both of the parents wanting their children to be home with them. [Mother] has completed all the services and corrected the conditions that brought the case into care. [Father] was noncustodial at the time, but still complied with our reunification services and completed them. There have been no incidents with him in regard to any of his visitation[.]"

¶ 23    What tipped the balance was that, by returning home with Mother, Son and Daughter would be able to stay with their older half-siblings, with whom they had bonded over the course of the case. "It's important," the court said, "that the children be provided with some of that continuity, even though they may be half siblings to one another, they are still siblings *** [and] because of the sibling relationship and the recommendations of the GAL who represents all four of the minors, I am going to grant the return home of [Son and Daughter] to [Mother]." The court entered a protective supervision order (705 ILCS 405/2-24 (West 2024)) that, among other things, allowed Father unsupervised overnight visits with the children on the same schedule as before. The court admitted that the order was "a little unconventional" but that it "would like to assure that [Father] gets the same amount of visitation that he has now with the children[.]"

¶ 24                                    ANALYSIS

¶ 25    On appeal, Father claims the court erred when it returned Son and Daughter to Mother's custody. granted Mother's motion and chose to return Son and Daughter to her custody and care over him because it was not in the minors' best interests. We disagree. Both parents did

exceptional work to remedy and rectify the issues that caused DCFS and the court system to intervene on behalf of Son and Daughter, and the trial court was fortunate that it had to pick between two exceptional options. Since it was in a superior position to make that decision, we defer to its sound judgment, which is amply supported by the evidence.

¶ 26    Under the Juvenile Court Act, the State may intervene on behalf of minors who allegedly have been abused, neglected, or dependent. 705 ILCS 405/1-1 *et seq.* (West 2024). When a child is adjudicated abused, neglected, or dependent, the court must determine, at a dispositional hearing, whether it is in the best interests of the child to be made a ward of the court, and if so, determine the "proper disposition best serving the health, safety, and interests of the minor and the public." 705 ILCS 405/2-22(1) (West 2024).

¶ 27    After disposition, the court retains jurisdiction and may modify the dispositional order at any time before the case is closed. 705 ILCS 405/2-23(2) (West 2024). In the best interests of the child, the court "may, at any time, vacate the original dispositional order and enter any other dispositional order that it could have entered under section 2–23(a) of the Act, thereby effecting a change in the custody and guardianship of the minor, if the court finds that to do so would be in the best interests of the child." *In re Austin W.*, 214 Ill. 2d 31, 44 (2005), *abrogated on other grounds by In re M.M.*, 2016 IL 119932.

¶ 28    When a child is made a ward of the court, a parent may petition the court, per section 2-28, "for the restoration of the minor to the custody of the minor's parents[.]" 705 ILCS 405/2-28(4) (West 2024). A section 2-28 petition for a change in custody is simply another dispositional hearing, where the court again considers if returning the child home is the proper disposition best serving the interests of the minor and the public. See *In re S.M.*, 223 Ill. App. 3d 543, 547 (1992). After a petition to restore a minor to the custody of their parent or parents is

filed, "the issue that singly must be decided is the best interests of the child." *In re Ashley K.*, 212 Ill. App. 3d 849, 879 (1991). If the court previously found the minor abused or neglected, "the court can restore custody to the parent only if the minor can be cared for at home without endangering her health or safety, and if it is in the child's best interests." *In re Desiree O.*, 381 Ill. App. 3d 854, 865 (2008). The best interests of the child is "the paramount consideration to which no other takes precedence." *Id.*

¶ 29 In determining the child's best interests, the court should examine the factors as laid out in the Juvenile Court Act, including "whether or not the dispositional order provides for a child's physical safety and welfare." *In re Marianna F.-M.*, 2015 IL App (1st) 142897, ¶ 33. The trial court's ruling will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Id.* ¶ 34. A decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *Id,*

¶ 30 A "best interests" determination includes the following factors: (1) the physical safety and welfare of the child; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including (but not limited to) the child's sense of security and familiarity; (5) the child's wishes and long-term goals, including their wishes "regarding maintaining connections with parents, siblings, and other relatives;" (6) the child's community ties; (7) the child's need for permanence, "which includes the child's need for stability and continuity of relationships with parent figures, siblings, and other relatives;" (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2024). No single factor is dispositive, as the overriding purpose of the Act is the best interests of the child. See *Desiree O.*, 381 Ill. App. 3d at 866.

¶ 31    The court's decision here was well rooted in the evidence at the dispositional hearing on Mother's (and Father's) section 2-28 motion. Put simply, the court had a choice between two parents who had made exceptional progress toward reuniting with their children. Both parents had taken their recommendations seriously and completed the required programs. Both appeared to be fit, willing and able to care for the children.

¶ 32    That said, in the trial court's eyes, several key factors tipped the scale toward Mother. The evidence clearly established that the children's "health and safety were not endangered by returning home to [their] mother," especially since they were already spending multiple nights with her without supervision. *Desiree O.* 381 Ill. App. 3d at 868. Every case worker and the GAL recommended the children be returned home with Mother. Son said that he wished to live with Mother. Their recommendations and the child's own desire carry significant weight.

¶ 33    And the trial court placed particular emphasis on the bond between Son, Daughter, and their older half-siblings who lived with Mother. The court noted that references to sibling bonds appear in several of the best-interests factors listed above. Son has lived nearly his whole life with his older half-sister and half-brother, either with Mother or in substitute care. Daughter, meanwhile, spends three days with her siblings each week, and permanency reports noted that she was close with them. Each caseworker favorably commented on the sibling bond as well.

¶ 34    To his credit, the evidence shows that Father also had completed the required services, had found a place to live with two bedrooms, and was working full-time. He argues that his living situation was more stable than Mother's, as Mother (and the children) would be living with Mother's parents in their two-bedroom house. He also points out that, at the time of the hearing, Mother was reportedly looking for work (though receiving unemployment benefits) and had applied to be a paid home caregiver for her mother and stepfather. Father, on the other hand,

was employed as a security guard at a local high school. Based on that, Father argues that the evidence "pointed to greater stability in the case of the father, including his employment and known housing situation."

¶ 35    We surely agree that Father made a strong case. But so did Mother, and we will not set aside a judgment "simply because a different conclusion may have been drawn from the evidence." *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 51. The court's judgment was well reasoned and supported by the record. We cannot say the opposite conclusion is clearly evident.

¶ 36    We also note that, though the court has returned the children to Mother, the court thought it so important that Father continue to have time with his children that it incorporated the existing visitation schedule into the protective supervision order. We agree with the trial court that everything here suggests that Father has made tremendous strides forward, taking his role seriously and putting in the work necessary to correct the issues he had at the beginning of this case. Both parents have made exceptional progress and had good reason to ask the court to return them home to them individually. They should be commended for their efforts.

¶ 37    The circuit court was fortunate to have a choice between two parents who had worked hard to reunite with their children. The choice the court made was not against the manifest weight of the evidence. We affirm.

¶ 38                          CONCLUSION

¶ 39    The judgment of the circuit court is affirmed.

¶ 40    Affirmed.