Order filed July 12, 2023.          2023 IL App (5th) 230138
Motion to publish granted
August 8, 2023.                      NO. 5-23-0138

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* EMMA L., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Jackson County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 22-JA-38 |
| v. | ) | |
| | ) | |
| Paul B., | ) | Honorable |
| | ) | Christy W. Solverson, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court, with opinion.
Presiding Justice Boie and Justice Moore concurred in the judgment and opinion.

**OPINION**

¶ 1    The respondent, Paul B., appeals the circuit court's December 20, 2022, dispositional order finding him an abuser and unfit to care for his child along with the circuit court's February 3, 2023, order denying his motion to vacate. On appeal, he argues that the court's findings that he was an abuser and unfit to care for the child violated his due process rights. For the following reasons, we vacate both the circuit court's adjudicatory and dispositional orders.

¶ 2                        I. BACKGROUND

¶ 3    Paul is the biological father of Emma L., born November 22, 2017. He was adjudicated Emma's father in proceedings filed in McHenry County, Illinois, at which time he was ordered to

1

pay child support. Emma's mother is Maria. Paul and Maria do not live together. Emma resides with Maria's aunt, Tina.[1]

¶ 4    On December 21, 2021, Paul filed a petition in Jackson County family court requesting the court establish custody and parental responsibilities. On December 30, 2021, a report was made to the Illinois Department of Children and Family Services (DCFS), alleging Emma was at a substantial risk of physical injury due to being in an environment injurious to her health and welfare while visiting with Paul. The agency ultimately classified the report as unfounded. On January 2, 2022, a second report regarding Emma was made against Paul that alleged sexual exploitation. That report was also classified as unfounded. On March 18, 2022, a third report was made to DCFS regarding cuts, bruises, welts, abrasions, and oral injuries. The agency also found that report was unfounded.

¶ 5    On April 11, 2022, a fourth report to DCFS claimed Paul was sexually inappropriate with Emma. An order of protection was issued for Emma in the family court proceedings. The report to DCFS alleged that Paul put lotion on Emma's vagina following a bubble bath. Later reports revealed that, prior to the fourth report, Emma contracted a yeast infection and Tina instructed Paul not to give Emma bubble baths. On April 22, 2022, Paul's home was raided by the FBI, at which time the agency took his computer and phone. On June 10, 2022, Paul's employer received an anonymous phone call stating that Paul had abused a minor. Paul was subsequently suspended by his employer. Following a hearing in the family case on July 29, 2022, the order of protection was dismissed. The same day, DCFS took protective custody of Emma.

---

[1]Neither Maria nor Tina are parties to this appeal. They are addressed solely to develop the factual background involving this matter. Maria does not live with Tina. Maria gave guardianship to Tina prior to the instigation of these proceedings.

¶ 6    The State filed a juvenile petition on August 1, 2022. The petition listed two counts against Paul alleging that Emma was abused by Paul pursuant to section 2-3(2)(iii) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(2)(iii) (West 2020)) and neglected pursuant to section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)) because Paul committed, or allowed to be committed, a sex offense against the minor child. A shelter care hearing was held on August 2, 2022. Although no transcript from the hearing is included in the record, the court's docket entry indicated that a DCFS investigator testified, probable cause was found, and DCFS was appointed temporary guardian. The entry further noted that DCFS recently received three reports regarding the minor and a forensic interview was performed at DCFS's request at Perry-Jackson Child Advocacy Center (CAC), during which time Emma disclosed multiple incidents of sexual abuse. A guardian *ad litem* (GAL) was appointed for Emma.

¶ 7    On September 14, 2022, the State filed a motion for *in camera* interview to obtain Emma's testimony at the adjudicatory hearing. Two days later, the State filed a "joint motion to continue," stating issues had "arisen which will have great effect upon the posture and future proceedings in this pending case." The State further alleged, "In preparation for hearing, the People have been provided with information, previously unknown, which could substantially change the course of this matter, and require further inquiry and investigation." The motion stated that all the parties were made aware of the issues, joined in the motion to continue, and consented to a waiver of the statutory time limits regarding commencement of an adjudicatory hearing. The adjudicatory hearing was rescheduled for October 17, 2022.

¶ 8    On September 19, 2022, the State filed a supplemental juvenile petition that again alleged abuse and neglect. Paragraph 4 alleged that Emma was abused pursuant to section 2-3(2)(ii) of the Act (*id.* § 2-3(2)(ii)) in that a substantial risk of physical injury existed, other than by accidental

3

means, because Emma's mother, Maria, was "a habitual user of methamphetamine since the summer of 2020 which rendered her incapable of adequately parenting the minor child." The paragraph further alleged that Maria tested positive for methamphetamine on September 16, 2022. Paragraphs 5 and 6 continued to allege Paul committed, or allowed to be committed, sex offenses against Emma. Attached to the pleading was correspondence from a social worker stating "[b]ased on previous sessions and interactions with Emma there have been multiple allegations/reports of sexual and physical abuse by [Paul]." The correspondence continued, "During a therapy session on April 11th, 2022, Emma made comments alluding to sexual abuse, such as, 'After daddy gave me a bath he took me to grammy's room and put lotion up here' while pointing at her vaginal area. Due to these statements, there are legitimate safety concerns in regard to unsupervised visitation."

¶ 9    On October 14, 2022, DCFS filed its assessment which recommended the following services for Paul: (1) participate in a sex offender assessment and follow recommendations, (2) attend weekly mental health therapy, (3) receive a psychiatric evaluation, (4) participate in drug testing, and (5) participate in parenting education. The document further stated that the prognosis of Paul's reunification with Emma was "poor," classifying his denial of the allegations as a "lack of responsibility" for his actions. The report also noted that Paul blamed Emma's aunt (Tina) for DCFS's involvement and believed the underlying cause was related to the custody dispute. The DCFS family service plan filed on October 14, 2022, contained the same recommendations. As to visitation, the plan stated, "Due to the nature of the allegations, visits between [Paul] and Emma have stopped." After noting that Paul had not seen Emma since April 20, 2022, the plan stated, "If visitation is resumed, it should be supervised closely and occur at the agency or a public setting."

4

¶ 10    The adjudicatory hearing was held on October 17, 2022. The circuit court read the new allegations in paragraph 4 to Maria as well as the allegations against Paul in paragraphs 5 and 6. Maria's counsel admitted the allegations in paragraph 4. Paul's counsel noted the State presented no evidence as to paragraphs 5 and 6 at the adjudicatory hearing and moved the court for dismissal of paragraphs 5 and 6. In response, the State replied, "It's a little unusual, your Honor, but in the grand scheme of things, what we're here for is the best interest of Emma *** so if the Court wishes to do that, it's okay, it really doesn't change anything." There being no objection and the State not wishing to proceed with paragraphs 5 and 6, the circuit court dismissed the counts. The circuit court admonished Paul that if the State wished to refile those allegations, it could.

¶ 11    Paul's counsel then stated his client had not been given any parenting time and that DCFS was required to offer some type of parenting time. The court stated, "That is not correct," and admonished counsel that DCFS had discretion to grant parenting time, but the court would entertain a motion for parenting time. Counsel stated, "Okay," and the court continued, "And if you want to go down that road, then we can leave [Paul] in this case with the allegations and go from there," Counsel replied, "No, we're good, your Honor." The court's adjudicatory order was filed on October 26, 2022, and found Emma was abused based on the knowing and voluntary stipulation by Maria. The order left DCFS as the legal custodian and stated visitation was at the discretion of the social service provider. The order further stated, "Upon motion of the Respondent, *** [Paul] is dismissed as a respondent to this proceeding as there is no objection by the state, the guardian *ad litem* or the mother's counsel."

¶ 12    Lutheran Social Services, who was contracted by DCFS to assist in this matter, filed its dispositional report on November 3, 2022. The report indicated that Emma was currently visiting with her mother but not her father. Tina advised the agency that when Emma visited with Paul,

Emma would often have behaviors[2] following the visits. Tina further reported to the agency that Emma expressed that she did not want to visit with her father and made comments such as "I never want to see him again" and "why is daddy so mean[?]" Tina also advised the agency that after visiting with her dad, Emma would often cry and clam up when asked how visits went. Based on the caregiver's statement, and a therapist's recommendation, the agency disallowed any further visitation with Paul. Paul was engaged in mental health services and parenting services through Centerstone. He was also compliant with the required random drug screens. Maria had not engaged in any services.

¶ 13    The dispositional hearing was held on November 14, 2022. Tina was reclassified as a foster parent after it was determined that the guardianship documentation was invalid. The State called Whitney Melton, a forensic interviewer at the CAC, as its first witness. Ms. Melton explained that it was her job to conduct forensic interviews in response to child abuse allegations and confirmed that an interview was performed with Emma on April 21, 2022. She further confirmed the interview was recorded and identified the DVD containing Emma's interview. The State moved to admit the DVD into evidence. The court asked if there were any objections, and Paul's counsel responded, "Subject to cross please, your Honor." The court responded that the DVD would be admitted subject to cross. On cross-examination, Ms. Melton confirmed that she had also had an earlier interview with Emma. She could not recall if it involved physical or sexual abuse. She did not review the prior interview before the April 21, 2022, interview or before the court hearing and could not recall whether Emma denied everything during the first interview. She stated she did not know the outcome of the previous DCFS investigation but would not be surprised if it was classified as unfounded.

---

[2]No explanation of the behaviors was contained within the report.

6

¶ 14    The State called Sara Sellers, a pre-kindergarten teacher at Unity Point, who stated that she first met Emma in November 2019. She testified that Emma was very talkative when she started in her class and Tina usually took her to school. During COVID, both Tina and Paul participated in the Zoom classes although she noted that Tina was more likely to send back the required documentation. Ms. Sellers testified that they returned to in-person school that year. Paul had Emma on Wednesdays and Fridays and would pick her up from school on those days. She stated that, once those visits started, she noticed a difference in Emma, in which Emma "became kind of introverted" and "really quiet." She would not have conversations with her friends. During parallel play, instead of playing next to a peer, she would just have free conversations with the teachers. Ms. Sellers also testified that nearly every time Paul picked Emma up from school, Emma would "peek around and look at the gate *** and just come really slow, like she didn't want to go." Ms. Sellers stated when Emma got to the gate, sometimes Paul would try to hug her, and Emma would pull away because she did not want to be hugged.

¶ 15    Ms. Sellers testified that once Paul stopped coming to the school to pick up Emma, there was a "drastic change in Emma's behavior and personality." She said Emma seemed happier and was very playful with her peers. Emma talked more about things that occurred in her life, like her recent trip to Disney World. She said Emma was different—more outspoken, more playful. She stated that Emma never spoke about her father.

¶ 16    On cross-examination, Ms. Sellers confirmed the school returned to "in-person" in the fall of 2021. She agreed she was in the classroom in March 2022 when DCFS showed up to talk to her and see Emma in the classroom. She admitted that Paul came to pick Emma up that day and Emma ran to her dad, hugged him, and was happy he was there to pick her up. She was unsure the date was in March 2022 and stated she only saw Emma do that with Paul one time. She could not

7

remember if the DCFS investigators were there. She testified that they document concerns about a child's behavior, and she had no documentation regarding Emma's behavior.

¶ 17　　The State's last witness was Dianna Hagler, who was a professional aide in the pre-kindergarten program at Unity Point. Her direct and cross-examination testimony was nearly identical to that provided by Ms. Sellers. The State rested. No witnesses were called by the GAL or Maria's counsel.

¶ 18　　Paul testified that he was 35 years old and worked for the Greater St. Louis United Council Boy Scouts of America. He held a bachelor's degree in history and a master's degree in public administration. He stated he was willing and able to take care of his daughter and provided his address in Carbondale, Illinois, where he had been living since June 2021. Prior to that he lived in Irvington, Illinois, which was where his family lived on the family farm that had been passed down through four generations. He moved to Carbondale because he wanted to be more involved in his daughter's life. He was also concerned because he heard reports of a DCFS investigation involving Emma's mother and potential concerns for Emma's safety.

¶ 19　　Paul testified that in 2022 he would pick Emma up from school on his visitation days. He disputed the teachers' testimony regarding Emma's behavior and stated that Emma would hold his hand walking back to the vehicle and occasionally wanted him to carry her. He stated that he was no longer allowed to pick up Emma after April 2022, when an emergency no contact order was issued. The no contact order was dismissed in July 2022. Thereafter, DCFS prohibited him from having any contact with Emma. He had not been allowed visitation with Emma since April 2022.

¶ 20　　Paul testified about the prior DCFS investigations and stated that on March 18, 2022, there was a scheduled home visit with child protective investigator (CPI) Beth Kimber. When he got to the school to pick up Emma, he went to the main office and was greeted by CPI Kimber and CPI

8

Kirstine. CPI Kirstine stated they were "closing this one down right now. You can go home with Emma." The home visit was canceled. At that point, Emma came out with Ms. Sellers and ran straight to Paul. He knelt down and they hugged. She held his hand as they walked out, with Ms. Sellers first accompanying them to get Emma's stuff out of her classroom. He stated there were numerous office workers who witnessed this event including the two CPIs. He stated the DCFS reports also documented the event.

¶ 21    Paul testified that he filed a petition for parental rights in December 2021. Two weeks later, he was turned in to DCFS. The report was classified as unfounded. Approximately two months later, a second report was made to DCFS, which was also determined to be unfounded. A third DCFS report was made approximately six weeks later and was dismissed because it did not rise to the level of what was necessary for DCFS to investigate.

¶ 22    On cross-examination from the GAL, Paul confirmed his suspension from his employment and stated it was now classified as a leave of absence. On redirect, Paul explained that he was suspended on June 10, 2022, after his employer received an anonymous phone call stating that he had abused a minor. At that time, he advised them of the pending DCFS investigation.

¶ 23    The circuit court asked for closing arguments. In response, the State requested the court reserve a determination on whether it was in Emma's best interest to be made a ward of the court until after it reviewed the DVD. The GAL and Maria's attorney echoed the request. Paul's attorney argued that if the court was going to review the DVD, and take it into consideration, that they had a right to ask for time to controvert whatever was on that DVD. Counsel confirmed he had seen the tape. The court stated that the dispositional hearing was based on the best interest of the child and the court had discretion as to the evidence it would review and stated it would do its diligence and review the admitted evidence. The State argued that pursuant to section 2-22 of the Act (705

9

ILCS 405/2-22 (West 2020)), all helpful evidence in determining the question including oral and written reports may be admitted and relied upon "even though not competent for the purposes of the adjudicatory hearing." Paul's counsel asked if written arguments could be presented, and the court said it did not need them.

¶ 24 Paul's counsel then cited section 2-22(2) of the Act (*id.* § 2-22(2)) and requested a fair opportunity to controvert the reports prepared for and considered by the court. The court advised Paul's counsel that if it wished "to present evidence with regard to this exhibit, then you certainly can do that today, that's why I've asked if you have reviewed it and you certainly knew it was going to be offered as an exhibit today." Paul's counsel responded, "No, I did not know that it was going to be offered as an exhibit. I know that they had that as evidence, but I was unaware as to whether they were going to offer it,[3] the whole thing as an exhibit or just bits and pieces of it." The court stated the video was admitted into evidence and it was going to review it in its entirety. The court also disagreed that it was required to advise the parties of the factual contents in the DVD that it would use in its determination. Paul's counsel again requested the opportunity to controvert the evidence the court was going to use in its determination. The court again stated that if he wanted to controvert the evidence on the DVD, "you may do so right now. Once I rule and issue the order you don't get a second bite at the apple." The court again told counsel that any evidence to the contrary would be allowed, stating, "the Court is more than willing to have further testimony here today if you would like to do so." Counsel stated they did not "have any other evidence today regarding what is on the video." The court then asked if he or anyone else felt they had not had a fair opportunity before the court, and Paul's counsel stated, "No, I'm not making

---

[3]The record contains a stipulation executed by the State and Paul's counsel that states, "The Parties hereby stipulate that the State did not inform the Respondent/Father/Appellant that the State was going to introduce the CAC/DVD at the Dispositional Hearing."

10

any allegations that we haven't had a fair opportunity to present evidence. *** We don't have any other evidence that we are going to present today at the hearing."

¶ 25    On December 20, 2022, the circuit court issued a dispositional order. The order noted the witnesses and the admission of the video, without objection. The order further noted that Paul testified, and the court took the case under advisement to review the exhibit. The court issued findings that included, *inter alia*, the following:

> "Although the mother stipulated to the allegations of the Amended Petition, the overall evidence, including DCFS Reports, the testimony in open court and the forensic interview of the minor child, show, by a preponderance of the evidence, the father to be an abuser of the minor child."

The court further found both parents were unfit to care for the minor child and it was in the best interest of the minor to remain adjudicated as an abused minor with custody and guardianship granted to DCFS. A permanency hearing was scheduled for April 6, 2023.

¶ 26    On January 5, 2023, Paul's counsel filed a motion to vacate, stating no subsequent allegations regarding Paul were made following the dismissal of the allegations at the adjudicatory hearing. The motion claimed the DVD interview relied upon by the court was inadmissible at the adjudicatory hearing, was uncorroborated, unsubstantiated, and not subject to cross-examination, as required by section 2-18 of the Act (*id.* § 2-18). Paul's motion further argued that counsel requested a fair opportunity to controvert the evidence on which the court would base the decision and the court failed to advise the parties of the factual contents and conclusions of the reports prepared for use by the court and also failed to advise what statements or evidence the court considered in its dispositional order, citing section 2-22(2) of the Act (*id.* § 2-22(2)). The remainder of the motion claimed Paul's due process rights were violated in that the court found

11

him to be an abuser and an unfit parent, and then deprived him of the custody and companionship of his child, when there was no pending petition for adjudication against him regarding abuse, neglect, or his unfitness as a parent.

¶ 27    On January 18, 2023, the GAL and the State filed a joint response in the form of an answer to Paul's motion to vacate. The relevant portions of the response argued that hearsay evidence was allowed at the dispositional hearing pursuant to section 2-22(1) of the Act (*id.* § 2-22(1)). The response further claimed the evidentiary standards set forth in Paul's motion were irrelevant to the court's dispositional hearing because the provision concerning hearsay evidence related to the adjudicatory hearing, not the dispositional hearing. The response further noted that Paul's counsel was provided an opportunity to controvert the evidence but failed to do so and further failed to object to the admission of the DVD.

¶ 28    On February 3, 2023, the circuit court issued an order denying the motion to vacate for the reasons set forth in the joint response from the State and the GAL. Paul timely appealed.

¶ 29                                    II. ANALYSIS

¶ 30    The basis of Paul's appeal is two-fold. The first basis claims a violation of Paul's due process rights based on the circuit court's finding him an abuser of his minor child and unfit as a parent at the dispositional hearing after previously dismissing the charges against him and dismissing him as a respondent in the case at the adjudicatory hearing. The second basis contends the circuit court's finding that he was an abuser and unfit parent was against the manifest weight of the evidence.

¶ 31    "The constitutional guarantee of due process is implicated 'whenever the State engages in conduct towards its citizens deemed oppressive, arbitrary[,] or unreasonable.' " *Wingert v. Hradisky*, 2019 IL 123201, ¶ 29 (quoting *People v. McCauley*, 163 Ill. 2d 414, 425 (1994)). "Due

12

process has two aspects: procedural and substantive." *Id*. " 'Procedural due process bars governmental action that infringes upon a protected interest when such action is arbitrary because it was not preceded by procedural safeguards,' whereas '[s]ubstantive due process bars governmental action that infringes upon a protected interest when such action is itself arbitrary.' " *Id*. (quoting *People v. Pepitone*, 2018 IL 122034, ¶ 13). Review of whether a party was deprived of a constitutional right is *de novo*. *In re Robert S*., 213 Ill. 2d 30, 45 (2004). As no argument regarding the validity of the underlying juvenile proceeding statutes was presented, we address Paul's appeal solely with regard to procedural due process.

¶ 32    Although not addressed by either party, three factors are considered "in determining what due process requires: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of the interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute safeguards would entail." *In re M.H*., 196 Ill. 2d 356, 363 (2001) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). These factors are equally applicable to determine issues involving parental due process rights. *Id*. at 363-66 (citing *Lassiter v. Department of Social Services*, 452 U.S. 18 (1981); *Santosky v. Kramer*, 455 U.S. 745 (1982); *In re D.R*., 307 Ill. App. 3d 478 (1999); *In re Vanessa C*., 316 Ill. App. 3d 475 (2000); *In re M.R*., 316 Ill. App. 3d 399 (2000); and *In re C.J*., 272 Ill. App. 3d 461 (1995)).

¶ 33    "Due process in the context of interference with parental rights is achieved by compliance with the provisions of the Juvenile Court Act and fundamental fairness." *In re D.T*., 2017 IL App (3d) 170120, ¶ 23. As such, we consider the statutes and case law addressing wardship proceedings. "A proceeding for adjudication of wardship represents a significant intrusion into the

13

sanctity of the family which should not be undertaken lightly." (Internal quotation marks omitted.) *In re A.P.*, 2012 IL 113875, ¶ 18. Such cases "involve relationships touching on fundamental rights, and the natural ties between parents and their children may not be severed on the basis of mere speculation." *In re Arthur H.*, 212 Ill. 2d 441, 477-78 (2004). To ensure certainty, "[t]he Act sets forth the procedures that must be followed in determining whether a minor should be removed from his or her parents' custody and be made a ward of the court." *In re M.M.*, 2016 IL 119932, ¶ 17. The determination of whether the child should become a ward of the court involves a two-step process. *In re A.P.*, 2012 IL 113875, ¶ 18.

¶ 34 The first step occurs at the adjudicatory hearing, during which time the court determines whether the minor is abused or neglected due to an adverse condition. 705 ILCS 405/2-21 (West 2020); *In re Arthur H.*, 212 Ill. 2d at 465-66. At this hearing, the parties must adhere to the "standard of proof and the rules of evidence in the nature of civil proceedings." 705 ILCS 405/2-18(1) (West 2020). The State has the burden to prove the alleged abuse or neglect by a preponderance of the evidence. *In re A.P.*, 2012 IL 113875, ¶ 17. The statute provides that *prima facie* evidence of sexual abuse is

> "proof that a parent, custodian, or guardian of a minor allows, encourages, or requires a minor to perform, offer, or agree to perform any act of sexual penetration as defined in Section 11-0.1 of the Criminal Code of 2012 for any money, property, token, object, or article or anything of value, or any touching or fondling of the sex organs of one person by another person, for any money, property, token, object, or article or anything of value, for the purpose of sexual arousal or gratification." 705 ILCS 405/2-18(2)(j) (West 2020).

14

The statute further allows the admission of previous statements made by the minor relating to any allegations of abuse or neglect. *Id.* § 2-18(4)(c). "However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." *Id.*

¶ 35 After hearing the evidence, "[i]f the court finds that the minor is abused, neglected, or dependent, the court shall then determine and put in writing the factual basis supporting that determination, and specify, to the extent possible, the acts or omissions or both of each parent, guardian, or legal custodian that form the basis of the court's findings." *Id.* § 2-21(1). If the court "determines that a person has inflicted physical or sexual abuse upon a minor," the court must "report that determination to the Department of State Police." *Id.*

¶ 36 The second step involves a dispositional hearing at which the court determines "whether it is in the best interests of the minor *** to be made a ward of the court." *Id.* § 2-22(1). At this hearing, the evidentiary rules are relaxed and "[a]ll evidence helpful in determining these questions, including oral and written reports," is admissible "and may be relied upon to the extent of its probative value, even though not competent for the purposes of the adjudicatory hearing." *Id.* If the court determines the child should be made a ward of the court, the court determines "the proper disposition best serving the health, safety[,] and interests of the minor and the public." *Id.* Possible dispositions include continued residence with the parent, restoration of custody to the minor's parent, a partial or complete emancipation, or placement with DCFS in accordance with section 2-27 of the Act (*id.* § 2-27). *In re M.M.*, 2016 IL 119932, ¶ 18.

¶ 37 "The choice of dispositional order rests within the sound discretion of the trial court and will be reversed only if the findings of fact are against the manifest weight of the evidence or the court committed an abuse of discretion by selecting an inappropriate dispositional order." (Internal

15

quotation marks omitted.) *In re L.W.*, 2021 IL App (5th) 200311, ¶ 26. A decision is against the manifest weight of the evidence "if the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, or not based on the evidence presented." *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

¶ 38    Returning to the due process factors, we find, as to the first factor, that the private interest at stake is Paul's interest in the control, custody, and care of his child, which is well established as a fundamental interest. See *Lulay v. Lulay*, 193 Ill. 2d 455, 470-71 (2000); *In re Paul*, 101 Ill. 2d 345, 354-55 (1984). We are cognizant that Paul's notice of appeal solely requested review of the circuit court's dispositional order. However, it is equally apparent that Paul's argument stems directly from the circuit court's adjudicatory order. Notices of appeal are to be liberally construed. *Daniels v. Anderson*, 162 Ill. 2d 47, 62 (1994). "[T]he failure to specify a particular order in a notice of appeal does not preclude our review of that order so long as the order that is specified directly relates back to the judgment or order from which review is sought." (Internal quotation marks omitted.) *In re Desiree O.*, 381 Ill. App. 3d 854, 863 (2008). "Accordingly, an order that is not specified in the notice of appeal is reviewable if it is a step in the procedural progression leading to the judgment specified in the notice of appeal." *Id.* (citing *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 435 (1979)). As such, we consider both steps of the wardship process as well as the case law cited by the parties to address the second factor of due process, *i.e.*, the risk of an erroneous deprivation of the interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards.

¶ 39    Typically, the first step in an adjudication of wardship determines whether the child was abused or neglected, and the second step determines whether the child should be made a ward of the court. See *In re N.B.*, 191 Ill. 2d 338, 343-44 (2000); *In re Z.L.*, 2021 IL 126931, ¶ 18. Here,

16

the State relies on *In re J.W.*, 386 Ill. App. 3d 847, 855 (2008), to state that a finding of abuse can be made at the dispositional hearing.

¶ 40    In *J.W.*, the State filed a petition of adjudication of wardship alleging that J.W. was neglected because, while residing with both parents, "J.W. received numerous bruises on various part of her body that would not ordinarily exist except for the acts or omission of a parent or custodian." *Id.* at 848. After the evidence submitted at the adjudicatory hearing revealed unexplained bruising, the circuit court deemed J.W. a neglected minor in that her environment was injurious to her welfare. *Id.* at 849. Following the dispositional hearing, the court found that both parents were responsible for the child's care and " 'both parents [were] unfit *** given the unexplained injuries that could not have occurred but for the abuse and neglect of this child.' " *Id.* at 851.

¶ 41    On appeal, the mother argued that the finding of neglect at the adjudicatory hearing and the court's disposition making J.W. a ward of the court and appointing DCFS as her guardian were erroneous. *Id.* at 851. The argument contended that both parents were not neglectful, and the evidence presented was insufficient to find the mother guilty of child neglect. *Id.* at 854. The appellate court noted that the circuit court was not required to determine "guilt" at the adjudicatory hearing—it need only determine if there was abuse or neglect. See *id.* While the circuit court was "to specify at the adjudicatory hearing the parents' acts or omissions that form the basis of the court's finding of abuse or neglect so as later to inform the court regarding its options when it conducts the dispositional hearing," the adjudicatory finding was "one of numerous factors that the court will consider at the later dispositional hearing." *Id.* at 855. The court continued by stating, "even if a court never made such a finding at the adjudicatory hearing, nothing bars the court from determining causation—and subsequently remediation—at the dispositional hearing." *Id.* The

17

court found the evidence sufficient to support the finding of neglect for both parents and affirmed the dispositional order. *Id*. at 855-56.

¶ 42    We do not disagree with the court's statements in the context of the facts revealing neglect set forth therein; nor do we disagree that a finding of neglect can be applied to both parents when both are responsible for the child's care. However, "each case involving allegations of neglect and adjudication of wardship is *sui generis* and must be decided on its own facts." *In re Arthur H*., 212 Ill. 2d at 470. Here, while allegations of abuse were brought against Paul, those allegations were dismissed due to the State's failure to present evidence on those allegations. Therefore, while the language from *In re J.W*. is compelling, the facts are easily distinguishable.

¶ 43    Factually, we find Paul's cited authority, *In re K.S*., 365 Ill. App. 3d 566 (2006), more directly on point. In *K.S*., the State filed a petition with two counts against the mother based on her alleged role in the murder of K.S.'s sibling and one count against the father that alleged sexual abuse of another sibling of K.S. *Id*. at 568. The State later withdrew all three counts and alleged a new count (IV) claiming the child was neglected due to an injurious environment stemming from the mother's failure to follow a DCFS safety plan. *Id*. At the adjudicatory hearing, the State provided a factual basis addressing the DCFS safety plan and the mother's failure to comply with said plan and the mother stipulated to the State's factual basis. *Id*. The court was also told the criminal case against the father—that was based on his sexual abuse of a different child—had been dismissed. *Id*. The court found K.S. neglected based upon the factual basis presented and mother's stipulation thereto. *Id*.

¶ 44    Thereafter, the court ordered the father to undergo a sexual offender evaluation, to which the father's counsel stated his client did not admit or stipulate to anything and disputed the need for the evaluation. *Id*. The court stated counsel could persist in father's denial, " 'but the evaluation

18

is going to be ordered. If they tell me you don't need any treatment, great, wonderful. All the better. But I am going to order that you follow through with that because I have to make sure that [K.S.] is safe.' " *Id*. at 568-69.

¶ 45 At the dispositional hearing, the State presented reports regarding the prior molestation charges, the mother's failure to comply with the DCFS safety plan, the father's claims that the child lied, the father's continued denial of responsibility for his actions, and his reluctance to comply with services regarding the sexual molestation charges. *Id*. at 569. The reports stated father needed to acknowledge his role in the sexual molestation allegation and complete the sexual offender evaluation. *Id*. No witnesses testified and, after hearing argument, the court made K.S. a ward of the court and granted legal guardianship to DCFS. *Id*. Following the determination, the circuit court addressed the father, stating the issue was not whether the prior criminal case was dismissed, the issue was that a child claimed molestation. *Id*. In order to protect the child, the court ordered him to complete the sexual offender evaluation in 30 days. *Id*.

¶ 46 The father argued on appeal that the circuit court erred in adjudicating K.S. an abused minor and ordering him to undergo a sexual offender evaluation. *Id*. at 570. With regard to the first argument, the appellate court disagreed and affirmed the finding of abuse based on the stipulation. *Id*. As to the second argument, the father argued that the court's requirement that he complete a sexual offender evaluation and follow the recommendations was in error because there was no competent evidence against him, and he was never given an opportunity to present evidence on his own behalf because the adjudicatory hearing was limited to issues involving the mother. *Id*. The appellate court agreed and found the circuit court's requirement was not based on the record, specifically noting that the circuit court had no direct evidence of abuse because no charges of sexual abuse were raised in the amended petition. See *id*. at 571-72.

19

¶ 47    After addressing what would be considered credible evidence, the court stated:

> "[I]f count III had not been withdrawn, an adjudicatory hearing would have been a proper and acceptable course of action to determine if respondent was a sex offender and posed a threat to K.S. ***
>
> Respondent was never given a hearing at which witnesses testified, with the opportunity to cross-examine witnesses and present his own evidence. The State foreclosed this possibility when it dismissed the criminal charge and withdrew the abuse allegations against respondent in count III." *Id.* at 573-74.

The court continued, "The law cannot allow a trial court to order such an evaluation based only upon uncharged, unsubstantiated, and unproved allegations that have been misconstrued as evidence. Furthermore, respondent demanded a hearing on the merits and an opportunity to confront witnesses but was denied that opportunity." *Id*. at 574. The court found that father's due process rights were violated (*id*.) and remanded the claim for a new dispositional hearing (*id*. at 575).

¶ 48    "Due process in the context of interference with parental rights is achieved by compliance with the provisions of the Juvenile Court Act and fundamental fairness." *In re D.T*., 2017 IL App (3d) 170120, ¶ 23. Here, as in *K.S.*, there are grave due process concerns with the State dismissing charges against a parent during an adjudicatory hearing only to use the evidence regarding the dismissed charges at a hearing with a lower evidentiary standard to show that the child should be made a ward of the court and removed from the parent's custody. The statute is clear. If the court finds after an adjudicatory hearing "that the minor is not [abused, neglected, or dependent], the court shall order the petition dismissed and the minor discharged." 705 ILCS 405/2-21(1) (West

2020). Here, despite the charges being dismissed against Paul, the minor was not discharged to Paul in contravention of the statute.

¶ 49    Further, after the charges were dismissed at the conclusion of the adjudicatory hearing, Paul's counsel raised the issue of Paul's lack of parenting time and stated that DCFS was required to offer some type of parenting time. The court disagreed and stated DCFS had the discretion of whether to grant parenting time. After Paul's counsel acknowledged the court's statement, the court continued by stating, "And if you want to go down that road, then we can leave [Paul] in this case with the allegations and go from there,"

¶ 50    The circuit court's comment reveals its rightful concern with dismissing the charges, *i.e.*, the potential merit of the dismissed sexual abuse charges. Our supreme court addressed a similar issue in *In re J.J.*, 142 Ill. 2d 1 (1991). In *J.J.*, the State filed a petition for adjudication of wardship against the parents. *Id*. at 4. At a later hearing, the State moved to dismiss the petitions against the father; however, the guardian *ad litem* objected. *Id*. The circuit court dismissed the petitions without prejudice after concluding it was precluded by the separation of powers doctrine from forcing the State to proceed with prosecution of the case. *Id*. Ultimately, the Illinois Supreme Court noted the case was civil, not criminal, and both the State and the court were charged with ensuring the best interest of the minor child was served. *Id*. at 8-9. "Under the Juvenile Court Act, the circuit court has not only the authority but the duty to determine whether the best interests of the minor will be served by dismissing a petition alleging abuse of a minor." *Id*. at 9. "[W]hen the State moves to dismiss a petition alleging abuse of a minor, the circuit court shall consider the merits of the motion and determine, on the record, whether dismissal is in the best interests of the minor, the minor's family, and the community." *Id*. "Only in this way will the circuit court be able to fulfill

21

its duty to ensure the best interests of the minor" and obtain the requisite information addressing the current condition and future welfare of the parties involved under the Act. *Id*. at 9-10.

¶ 51 Here, it was Paul's attorney who requested the dismissal; however, no objection to the dismissal was presented by the State. We see no reason why the supreme court's requirement in *J.J.*—that a court have a hearing on a request to dismiss—would not equally apply to a request by a respondent in which the State provides no objection. Accordingly, we find that the circuit court erred by failing to hold a hearing on the dismissal to determine if said dismissal was in Emma's best interest. It was this error that led to the due process quandary now before this court that was also seen in *K.S. In re K.S.*, 365 Ill. App. 3d at 568, 570.

¶ 52 The dismissals in both *In re K.S.* and the case at bar eliminated the fathers' opportunity to address the abuse charges at the adjudicatory hearing. Procedural due process requires " 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " *Rosewell v. Chicago Title & Trust Co*., 99 Ill. 2d 407, 411 (1984) (quoting *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950)). While Paul was given notice of the adjudicatory hearing—which was the statutory proceeding established to address the State's juvenile petition allegations—due to the State's failure to present evidence, and the dismissal of Paul's allegations, Paul was not given a meaningful opportunity to be heard through counsel and to defend the allegations. To allow the State to then present evidence at the dispositional hearing, that was inadmissible at the adjudicatory hearing, to prove that it was not in Emma's best interest for Paul to have custody, undermines the due process protections of a full and fair hearing. Accordingly, as to the second factor, we find that requiring the State to either prove the allegations in a wardship proceeding at the adjudicatory hearing or provide the basis for the dismissal of the allegations reduces the possibility of the circuit

22

court issuing a dispositional order that undermines due process guarantees. Following such process further renders the need for additional or substitute procedural safeguards unnecessary.

¶ 53    As to the third factor, we find the government also possesses a compelling interest in ensuring the safety of children, and we see no added fiscal or administrative burden arising from requiring the State to prove its case at the adjudicatory hearing or providing a basis for either its own or its acquiescence in another's request for dismissal of the charges.

¶ 54    Here, the State submitted a DVD that would be inadmissible at an adjudicatory hearing, to convince the circuit court that Paul was an abuser at the dispositional hearing, despite allowing the dismissal of all charges of abuse against Paul at the adjudicatory hearing. The State's failure to first provide Paul with an opportunity to address both the charges and the DVD evidence at the adjudicatory hearing violated Paul's due process rights. While a unique circumstance may warrant a different result, evidence inadmissible at an adjudicatory hearing may not be used to revive previously dismissed allegations at a dispositional hearing. Accordingly, we vacate the trial court's dispositional order.

¶ 55    On appeal, in addition to requesting reversal of the dispositional order, Paul requested we require the circuit court to immediately return Emma to Paul. We note the same request was made, and ultimately denied, in *K.S. In re K.S.*, 365 Ill. App. 3d at 573, 575-76. Unlike *K.S.*, which involved the filing and dismissal of criminal charges against the father, the record is devoid of any criminal charge against Paul related to any alleged sexual abuse or the FBI raid on his home. Regardless, we do not believe that vacating the dispositional order requires immediate placement of Emma with Paul because the validity of the underlying allegations remains unaddressed.

¶ 56    Here, due to the lack of any hearing to determine the merits of the motion to dismiss, the sexual abuse allegations continue to permeate the case without any adjudication as to the merits.

23

Such circumstances render it difficult for a court to satisfy its obligation to protect the best interests of Emma, and equally difficult for the agency to determine the relevant services, if any, Paul must complete before reunification occurs.

¶ 57    As noted above, Paul's services include a sexual offender evaluation and treatment along with parenting services that include visitation. Despite the sexual abuse allegations being unproven and unsubstantiated, Paul is still required to participate in these services and has been denied all parental visitation for over 14 months. These serious allegations are not taken lightly; however, Paul's parenting time with his daughter is an "inherent right." See *In re L.W.*, 2021 IL App (5th) 200311, ¶ 34. This record does not clearly determine whether Paul was merely inept in trying to treat his daughter's yeast infection with yogurt[4] or sexually abused his daughter. Nor does the record clearly support any of the other allegations that were classified as unfounded. While this record is inconclusive, it would be presumptuous to assume that more compelling evidence is unavailable or nonexistent.

¶ 58    For these reasons, we vacate both the adjudicatory hearing order and the dispositional order. On remand, we direct the circuit court to proceed with either an adjudicatory hearing on the sexual abuse charges or a hearing on the dismissal of the charges that will (1) allow the court to determine whether the allegations are sufficiently supported by evidence to allow them to remain a factor in the case; (2) allow the agency to determine which future services, if any, are required for Paul, which, in turn, will provide certainty for Paul as to what services are necessary, if any, to regain custody of his child; and (3) protect Emma's best interests.

---

[4]The DVD submitted at the dispositional hearing revealed that yogurt, not lotion, was the product placed on or in Emma's vagina.

¶ 59    Finally, given the uncharged, unsubstantiated, and unproved allegations of sexual abuse, we express concern regarding the lack of visitation provided to Paul in the 15 months since Emma was taken into care with no definitive finding of abuse. The only court order prohibiting contact was dismissed by the family court nearly a year ago. Despite the agency retaining a permanency goal of return home, no visitation between Paul and Emma has been allowed. The agency must adhere to its regulations regarding visitation (89 Ill. Adm. Code 301.210 (eff. Sept. 14, 2001)) and "ensure that the parents and children have frequent visitation and contact with one another" (89 Ill. Adm. Code 315.130(a)(4) (eff. Dec. 31, 2015)). Accordingly, we suggest the circuit court issue an order directing the agency to comply with its regulations if Paul's visitation with Emma remains denied.

¶ 60                                    III. CONCLUSION

¶ 61    For the reasons stated herein, we vacate the circuit court's adjudicatory and dispositional orders and remand for proceedings in accordance with this opinion.


¶ 62    Orders vacated and remanded with directions.

**No. 5-23-0138**

| | |
|---|---|
| **Cite as:** | *In re Emma L., a Minor*, 2023 IL App (5th) 230138 |
| **Decision Under Review:** | Appeal from the Circuit Court of Jackson County, No. 22-JA-38; the Hon. Christy W. Solverson, Judge, presiding. |
| **Attorney for Appellant:** | Michael D. Burke, of Southern Illinois Law Center, LLC, of Carbondale, for appellant. |
| **Attorneys for Appellee:** | Joseph A. Cervantez, State's Attorney, of Murphysboro, (Patrick Delfino, Patrick D. Daly, and Max C. Miller, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |