2024 IL App (1st) 230508

Fourth Division
Opinion filed February 1, 2024

No. 1-23-0508

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* D.M., Minor-Appellee, | ) | Appeal from the |
| | ) | Circuit Court of Cook County |
| | ) | |
| (The People of the State of Illinois, | ) | No. 22 JA 00772 |
| Petitioner-Appellee, v. Lindsey M. and | ) | |
| David N., Respondents (Lindsey M., | ) | The Hon. Patrick T. Murphy, |
| Respondent-Appellant)). | ) | Judge, presiding. |

_____

JUSTICE OCASIO delivered the judgment of the court, with opinion.
Presiding Justice Rochford and Justice Martin concurred in the judgment and opinion.

**OPINION**

¶ 1    In this appeal, respondent-appellant, Lindsey M. (Lindsey), the mother of minor D.M., appeals from the trial court's disposition order adjudicating D.M. a ward of the court after finding that D.M. was neglected due to an injurious environment. Lindsey argues that she was denied a fair adjudication hearing based on cumulative error. We reverse the order finding that D.M. was neglected, vacate the disposition order, and remand for a new adjudication hearing.

¶ 2                                BACKGROUND

¶ 3    D.M. was born on September 26, 2022, to mother Lindsey and father David N., who is not a party to this appeal. On October 12, 2022, the State filed a petition for adjudication of wardship

and motion for temporary custody of D.M. The petition alleged D.M. was neglected due to an injurious environment and abused due to substantial risk of physical injury, pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2022)). The petition alleged the following:

> "Mother was hospitalized for an accidental drug overdose while pregnant with this minor. On or about October 4, 2022 mother was hospitalized due [to] a drug induced seizure. This minor was present during this incident. Per medical personnel, mother tested positive for illegal substances during this hospitalization and left against medical advice. Mother denies using illegal substances. Putative father's identity and whereabouts are unknown."

¶ 4    On October 12, 2022, the trial court placed D.M. in the temporary custody of the Department of Children and Family Services (DCFS) after a temporary custody hearing.

¶ 5    The trial court held the adjudicatory hearing on January 18, 2022. The trial court admitted People's exhibit Nos. 1 and 2, which contained medical records of Lindsey's hospitalizations of September 5, 2022, and October 4, 2022, as well as D.M.'s birth and prenatal appointments records. These records revealed the following.

¶ 6    On September 5, 2022, Lindsey, who was pregnant, was taken to the emergency department at St. Catherine's Hospital after being found unresponsive. Medical personnel suspected a probable drug overdose, so they treated her with Narcan, a medicine used to resuscitate someone experiencing an opiate overdose. Lindsey tested positive for cannabinoids but no other drug.

¶ 7    On September 25, 2022, Lindsey gave birth to D.M. by caesarean section. Lindsey tested positive for tetrahydrocannabinol (THC) at that time.

¶ 8    On October 4, 2022, Lindsey was admitted to the hospital, through the emergency room, due to a seizure. At the hospital she was diagnosed with eclampsia and elevated blood pressure. Lindsey did not have a seizure during the hospital visit. Lindsey was closely monitored with appropriate medication. Lindsey left the hospital against medical advice.

¶ 9    While at the hospital, Lindsey reported that she only used marijuana but denied the use of cocaine. Lindsey tested positive for cocaine and cannabinoids; these tests were listed as positive but "unconfirmed." The records indicate "patient did have drug overdose" and "possible substance abuse overdose" or "suspect overdose."

¶ 10    At the adjudicatory hearing, the State called David as their first witness. David admitted to being D.M.'s father. The trial court then entered a finding of paternity.

¶ 11    The State next called Heather Gomez, a DCFS child protection investigator. Ms. Gomez testified she was assigned D.M.'s case to investigate neglect allegations due to Lindsey having two hospitalizations that were related to "substance abuse." Ms. Gomez reviewed the medical records of Lindsey's September 5, 2022, and October 4, 2022, hospital visits.

¶ 12    Ms. Gomez wanted to see D.M. and arranged a meeting with Lindsey at D.M.'s pediatric appointment.

¶ 13    At the meeting, Lindsey told Ms. Gomez that she had been hospitalized due to her sugar levels on September 5, 2022. D.M. had no signs of abuse and appeared to be well taken care of. The doctors had no concerns. Lindsey told Ms. Gomez that she used marijuana but denied consuming any other drugs. Lindsey reported that she did not remember any Narcan being

3

administered. Lindsey also told Ms. Gomez, when asked about her marijuana use, that her obstetrician did not "care about marijuana, they don't care about that."

¶ 14    The State directed Ms. Gomez to review her notes that she had received relating to an intact DCFS case involving Lindsey from 2007. Lindsey's counsel objected to the admission of any evidence of the 2007 intact case based on relevance and the age of the case. The trial court stated, "Well, I don't know what it was," and it overruled the objection. The trial court stated that the weight given to this testimony may not be great given the age of the case. When the State asked if the DCFS intact case record was "kept in the normal course of business," Ms. Gomez stated that it was. The State then proceeded to ask if what was reported in the intact notes pertained to Lindsey's children. Lindsey's counsel objected based on hearsay, and the trial court overruled the objection.

¶ 15    Ms. Gomez went on to testify as to Lindsey's other children. Lindsey had a child in 2005 who was substance-exposed and was adopted. Lindsey had another child who was also removed and adopted around 2000 due to allegations of substantial risk of harm and inadequate supervision. Lindsey had a third child, and because she was incarcerated, she arranged for a family member to have private guardianship. The State then asked Ms. Gomez who was indicated in these past reports and what they were indicated for. Ms. Gomez responded that Lindsey was indicated and the two allegations she remembers were "inadequate supervision and one of *** being substantial risk of physical injury." Ms. Gomez testified that there had been five previous investigations identified by DCFS since Lindsey's current investigation was in the "F sequence." Ms. Gomez did not know how many children or the names of the children that were DCFS involved. Ms. Gomez said she would "need to double-check on" what had happened in the case where Lindsey gave private guardianship to a family member.

¶ 16    Once the State completed its direct examination of Ms. Gomez, the trial court interjected and stated that while it always lets in testimony about whether an agency indicated a report, it has "to judge whether there was neglect." The trial court also said, "The fact that the department indicated this case is almost irrelevant. *** I have to hear evidence." The trial court noted that it would give "a feather worth of weight" to a social worker's opinion to indicate a report. The trial court stated, "[O]therwise let's have the social worker make a finding of neglect and we don't need judges. It's absurd." At the trial court's prompting the State then recalled Ms. Gomez to the witness stand again and asked more questions regarding sequence F.

¶ 17    On cross-examination by Lindsey's counsel, Ms. Gomez testified that according to the medical records. D.M. tested positive for THC when he was born. In addition, Lindsey had a medical marijuana card approved by a doctor. D.M. had no medical condition when he was born and was discharged to Lindsey's care.

¶ 18    The guardian *ad litem* (GAL) neither called witnesses nor offered any evidence but requested that the trial court admit the medical records from St. Catherine's Hospital. The GAL directed the trial court's attention to Lindsey's positive findings regarding cocaine and cannabinoids in those records.

¶ 19    Neither Lindsey nor David presented any evidence.

¶ 20    After all the parties had the opportunity to present evidence, the trial court *sua sponte* called Lindsey to testify. No party had chosen to call Lindsey. The trial court stated that "the judge has more input in this" and "it's a real old-fashioned *parens patriae*, court of chancery."

¶ 21    The trial court asked Lindsey her age and place of residence. The trial court then asked her about her other children. Lindsey said that she had agreed to the adoption of one of her children because she had been the victim of a rape. Her other children are 15 and an adult; she sees those

5

children because they lived with family members. The court questioned Lindsey about her home and work life and her history of delinquency and criminality. She was also asked whether any relatives could take care of D.M.

¶ 22    The trial court questioned Lindsey about the October 2022 medical records that indicated she was using cocaine. Lindsey denied that she used cocaine. When the trial court inquired as to how cocaine would "turn up in [her] system," Lindsey answered that the marijuana she purchased could have possibly been contaminated with cocaine. The trial court then asked whether her incarceration was for the sale of marijuana; Lindsey answered that it was.

¶ 23    Lindsey was then cross-examined by the GAL. The GAL asked about David and whether they lived together in Hammond, Indiana. Lindsey stated that she would stay with him on occasion but did not "fully" live with him. Lindsey was aware of eviction proceedings involving David's address where she would stay, but she had nothing to do with it. The GAL asked if she had to move back to Indiana because of her guilty plea to a criminal case. Lindsey answered the GAL and said she had to move to Indiana to comply with "some other things" due to the criminal case. The trial court then asked what she pled guilty to, in which she answered, "a theft from three years ago." Lindsey's counsel objected to the questioning regarding the criminal case based on relevance. The trial court did not rule on the objection but stated, "[I]t's relevant for dispositional reasons if not adjudicatory reasons." Lindsey's counsel then noted that the proceedings were not at the dispositional stage. The trial court then responded, "[S]ince she's on the stand, I want to start figuring it out."

¶ 24    Lindsey's counsel then cross-examined her and asked questions regarding her ability to care for D.M. Lindsey stated she had clothes, toys, diapers, formula, and bottles. The trial court then interjected and asked, "[D]o you have a [case]worker here for dispositional purposes if we

6

get that far?" The State said they did. Lindsey's counsel then asked for a few minutes before they got to that point, to which the trial court responded, "No, no, I'm just getting ahead of myself." Lindsey then testified she had friends, family, and David to help her provide suitable care for D.M.

¶ 25 The trial court then *sua sponte* called David as a witness. He was asked questions regarding his home, work life, how many children he had, the care of his children, and the care of D.M. David testified that he was a welder and had been welding for 23 years. His other six children lived with their mothers. David testified that he was equipped to care for D.M. and had a crib, diapers, clothing, a room, and bassinet. His mother would help him take care of him while he was at work. David offered to have Lindsey move in with him.

¶ 26 The State and GAL coalesced and requested findings of neglect injurious environment and abuse due to substantial risk of physical injury. The trial court interrupted the GAL's closing argument and stated it did not accept that Lindsey was admitted to the hospital due to poisoning by unspecified drugs.

¶ 27 After closing arguments were concluded, the trial court ruled the following:

> "Yeah, it's a tough case. I'm going to make a finding of [neglected due to environment injurious to his welfare] by 50 percent plus a feather. It's a very, very weak case, but I believe the October incident as I indicated in and of itself doesn't show—it's very poor judgment and maybe someone did it for—but when you put it together with the background and include the incarceration for selling drugs, it's—it's a background that lends itself to a great deal of doubt, so I'm going to make that finding and move to disposition."

¶ 28 The trial court immediately began the dispositional hearing, which was held over two days. There was a written disposition order, and the findings were consistent with the oral findings. Nicole Dorsey, the caseworker for D.M.'s case, testified. The trial court admitted Lindsey's November 2022 DCFS clinical social assessment, which described her history with her children, services she needed, and a plan for reunification. David was allowed to speak in court and was asked questions by the trial court. Prior to the trial court's ruling, DCFS counsel asked the trial court to enter a permanency order due to DCFS possibly being able to offer additional services for D.M. to return home in 12 months.

¶ 29 The trial court adjudicated D.M. a ward of the court and entered an order with a permanency goal of returning home in 12 months. Lindsey has appealed.

¶ 30 ANALYSIS

¶ 31 Claim That the Trial Court Assumed the Role of an Advocate

¶ 32 Lindsey first argues that the trial court assumed the role of an advocate, depriving her of a fair trial.

¶ 33 A trial judge generally has the authority to question witnesses in an effort to get to the truth or shed light on material issues. *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 26. Nonetheless, the trial court cannot deviate from its judicial duties or act as an advocate for either party. *Id.* When a case is a bench trial, the trial judge has more discretion in questioning witnesses since there is a lower risk of prejudice and the court's questions are appropriate for its fact-finding function. *Id.* "The propriety of an examination of a witness by the trial court must be determined by the circumstances of each case and rests within the discretion of the trial court." *In re Maher*, 314 Ill. App. 3d 1088, 1097 (2000). "A court abuses its discretion when it adopts the role of advocate for one of the parties and prejudices the opposing party." *In re Zoey L.*, 2021 IL App (1st)

8

210063, ¶ 36. To show prejudice in a bench trial, the aggrieved party must show that the trial court's questioning indicates that the trial court has prejudged the outcome before hearing all the evidence. *Id.*

¶ 34   The Act (705 ILCS 405/1-1 *et seq.* (West 2022)), establishes the procedure used to determine whether a child should be removed from his or her parents and declared a ward of the court. It is the State's burden to prove allegations of abuse and neglect by a preponderance of the evidence. *In re A.P.*, 2012 IL 113875, ¶ 17. The court must dismiss the petition if the State is unable to prove the allegations of abuse, neglect, or dependency by a preponderance of the evidence. *Id.*

¶ 35   Here, we need not decide whether the trial court overstepped and acted as advocate, as we find that the trial court in calling Lindsey and David abused its discretion in another way. The trial court's questions to Lindsey and David about their ability to parent and care for D.M. conflated the adjudicatory and dispositional phases of the case. As will be discussed, the conflating of the two phases resulted in a violation of the applicable statutory rules and an unfair hearing.

¶ 36           Claim That the Evidentiary Portion of the Dispositional Hearing
                    Was Collapsed Into the Adjudicatory Hearing

¶ 37   Lindsey next argues that the trial court deprived her of due process by collapsing the dispositional hearing into the adjudicatory hearing. For the following reasons, we agree with Lindsey.

¶ 38   "The constitutional guarantee of due process is implicated whenever the State engages in conduct towards its citizens deemed oppressive, arbitrary[,] or unreasonable." (Internal quotation marks omitted.) *In re Emma L.*, 2023 IL App (5th) 230138, ¶ 31 (quoting *Wingert v. Hradisky*, 2019 IL 123201, ¶ 29). Governmental action that arbitrarily violates a protected interest is prohibited under procedural due process when it was not preceded by procedural safeguards. *Id.*

9

Review of whether a party has been deprived of a constitutional right is *de novo*. *Id.* Lindsey argues that she was deprived of due process by the trial court collapsing the evidentiary portion of the dispositional hearing into the adjudicatory hearing, which would fall under procedural due process.

¶ 39    When a party is claiming a due process violation, the following three factors are considered:

> " '(1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of the interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute safeguards would entail.' " *Id.* ¶ 32 (quoting *In re M.H.*, 196 Ill. 2d 356, 363 (2001)).

These factors apply particularly when parental "due process" rights are involved. *Id.* " 'Due process in the context of interference with parental rights is achieved by compliance with the provisions of the Juvenile Court Act and fundamental fairness.' " *Id.* ¶ 33 (quoting *In re D.T.*, 2017 IL App (3d) 170120, ¶ 23).

¶ 40    A proceeding for adjudication of wardship " 'represents a significant intrusion into the sanctity of the family which should not be undertaken lightly.' " *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004) (quoting *In re Harpman*, 134 Ill. App. 3d 393, 396-97 (1985)). The act of severing a parent and child relationship is an extreme act because parents have a superior right to raise their children. *In re Adoption of Syck*, 138 Ill. 2d 255, 274-75 (1990). Once the trial court finds the parent unfit, "the parent's rights must yield to the child's best interest." *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002). To make sure the child's interests are properly prioritized, a court

assesses what is in the child's best interest at a separate hearing. *In re A.P.*, 277 Ill. App. 3d 592, 599-600 (1996). " 'When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.' " *In re D.T.*, 212 Ill. 2d 347, 359 (2004) (quoting *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982)).

¶ 41 Upon the filing of a petition by the State, the Act mandates that a temporary custody hearing take place, during which the court will decide whether there is reason to believe that the child is being neglected, whether it is necessary to remove the child from the home immediately, whether reasonable efforts have been made to prevent the removal of the child, or whether no efforts can be made that are reasonable in the circumstances to prevent or eliminate the need for removal. 705 ILCS 405/2-10 (West 2022); *In re Arthur H.*, 212 Ill. 2d at 462. The trial court must determine if there has been abuse, neglect, or dependency after placing a child in temporary care before it conducts an adjudication of wardship. 705 ILCS 405/2-21 (West 2022). The legislature has stated that the purpose of an adjudicatory hearing is to "determine whether the allegations of a petition *** that a minor under 18 years of age is *** neglected *** are supported by a preponderance of the evidence." *Id.* § 1-3(1). The court is to focus solely on whether the child has been neglected.

¶ 42 The Act requires that the adjudicatory hearing be conducted separately from the dispositional hearing. *In re Timothy T.*, 343 Ill. App. 3d 1260, 1265 (2003). An adjudicatory hearing does not need to be lengthy or a burdensome process because the dispositional hearing may be held immediately after the adjudicatory hearing. *Id.* at 1265-66. The trial court must establish a "clear line of demarcation" between the adjudicatory hearing and the dispositional hearing. *Id.* at 1266. In an adjudicatory hearing, the trial court hears the evidence and determines whether or not the minor has been abused, neglected, or dependent. 705 ILCS 405/2-21(1) (West

2022). If the trial court finds that the minor is abused, neglected, or dependent, the trial court is to put its findings in writing along with the factual basis supporting the determination. *Id.* After the trial court makes the entry of the finding, the trial court shall set a time no later than 30 days for a dispositional hearing. *Id.* § 2-21(2). At the dispositional hearing, the trial court shall determine if it is in the minor's best interest to be made a ward of the court. *Id.* In the dispositional hearing evidence concerning the "family situation and background, economic status, education, occupation, history of delinquency or criminality, personal habits, and any other information that may be helpful to the court" is heard. *Id.*

¶ 43    Regarding the due process factors, first we find that Lindsey has a fundamental interest in the control, custody, and care of her child. Second, we risk the erroneous deprivation of this fundamental interest by failing to comply with procedures as set forth in the Act. Third, we acknowledge that the government has a compelling interest in protecting children and ensuring their safety. Nonetheless, requiring the State to prove its case at the adjudicatory hearing is not overly burdensome.

¶ 44    The first step of an adjudication of wardship is determining whether the child was neglected or abused, and the dispositional hearing, the second step, determines whether the child should be made a ward of the court. Here, the State alleged that D.M. was neglected due to an environment injurious to his welfare and abused due to a substantial risk of physical injury. During the adjudicatory hearing, the trial court called Lindsey and David to testify and answer questions about their home, work life, and other children. They were asked about their ability to care for D.M. Lindsey was asked about her criminal history. These were relevant questions, indeed, but more appropriate for the dispositional hearing. The trial court collapsed the evidentiary portion of the

12

adjudicatory hearing with the dispositional hearing. This deprived Lindsey from having a fair hearing.

¶ 45    Claim That the Trial Court Erred in Admitting Ms. Gomez's Hearsay Testimony

¶ 46    Lindsey next argues that the trial court erred in admitting Ms. Gomez's hearsay testimony about Lindsey's past DCFS involvement over her objection. For the following reasons, we agree with Lindsey.

¶ 47    The rules of evidence for civil proceedings apply to adjudicatory hearings. *Id.* § 2-18(1). Under those rules, hearsay is generally inadmissible. Ill. R. Evid. 802 (eff. Jan. 1, 2011). Under the business records exception,

> "[a] memorandum, report, record, or data compilation, in any form,
> of acts, events, conditions, opinions, or diagnoses, made at or near
> the time by, or from information transmitted by, a person with
> knowledge, if kept in the course of a regularly conducted business
> activity, and if it was the regular practice of that business activity to
> make the memorandum, report, record or data compilation, all as
> shown by the testimony of the custodian or other qualified witness,
> or by certification that complies with Rule 902(11)"

of the Illinois Rules of Evidence shall be admissible in evidence. Ill. R. Evid. 803(6) (eff. Mar. 24, 2022). The Act provides a variation of the business record exception, providing that "[a]ny writing, record, photograph or x-ray of any hospital or public or private agency" relating to a minor in an abuse, neglect or dependency proceeding shall be admissible evidence. 705 ILCS 405/2-18(4)(a) (West 2022). The records from the hospital or public or private agency must be certified by the head of the hospital or its designee. *Id.*

13

¶ 48 Service plans and investigation documents from DCFS are admissible under section 2-18(4)(a) of the Act. *In re D.D.*, 2022 IL App (4th) 220257, ¶ 41. The business record itself, not the testimony of a witness who refers to it, is admissible in a proceeding to terminate parental rights under the Act's business records exemption. *In re M.H.*, 2020 IL App (3d) 190731, ¶ 19 (the court erred in allowing the caseworker to testify regarding information she gleaned from reading the file she inherited with the case). " 'We review the admission of evidence pursuant to section 2-18(4)(a) for an abuse of discretion.' " *Id.* ¶ 17 (quoting *In re J.Y.*, 2011 IL App (3d) 100727, ¶ 13.)

¶ 49 Here, the State sought to admit hearsay testimony from Ms. Gomez using the business record exception. The court allowed Ms. Gomez to testify regarding the DCFS reports which were prepared well before Ms. Gomez began working for DCFS in 2018, so we may presume those DCFS reports were not authored by her. More importantly, the DCFS reports themselves were never admitted as evidence. Ms. Gomez's testimony about Lindsey's past DCFS involvement was inadmissible hearsay, and the trial court erred in admitting this testimony.

¶ 50 The admission of this evidence was not harmless. The trial court relied on Ms. Gomez's inadmissible hearsay testimony to find D.M. neglected. The trial court conceded that the State's case was "very, very weak" and that it was only finding neglect by 50% plus "a feather." Lindsey was prejudiced by the admission of this testimony.

¶ 51                     The Claim That Cumulative Error Resulted in
the Denial of a Fair Adjudicatory Hearing

¶ 52 Finally, Lindsey argues the cumulative errors deprived her of a fair adjudicatory hearing. For the following reasons, we agree with Lindsey.

¶ 53 This court has recognized that "individual trial errors that do not alone warrant reversal may cumulatively deprive a defendant of a fair trial." *People v. Quezada*, 2022 IL App (2d)

200195, ¶ 74 (citing *People v. Redmon*, 2022 IL App (3d) 190167, ¶ 34). When such cumulative error occurs, " 'due process and fundamental fairness require' " the judgment to be reversed preserve the integrity of the judicial process. *Id.* (quoting *Redmon*, 2022 IL App (3d) 190167, ¶ 34).

¶ 54    The trial court in its questioning of Lindsey and David at the adjudicatory hearing collapsed the adjudicatory hearing into the disposition hearing, which violated the Act and Lindsey's due process rights. Additionally, the admission of Ms. Gomez's inadmissible hearsay testimony was prejudicial.

¶ 55    Based on the cumulative error, we reverse the order finding D.M. was neglected, vacate the disposition order, and remand for a new adjudication hearing.

¶ 56                    CONCLUSION

¶ 57    For the reasons stated, we reverse the order finding D.M. was neglected, vacate the disposition order, and remand for a new adjudication hearing.

¶ 58    Reversed in part and vacated in part; cause remanded.

*In re D.M.*, 2024 IL App (1st) 230508

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 22-JA-00772; the Hon. Patrick T. Murphy, Judge, presiding. |
| **Attorneys for Appellant:** | Sharone R. Mitchell, Jr., Public Defender, of Chicago (_____, Assistant Public Defender, of counsel), for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham and _____, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (_____, of counsel), guardian *ad litem*. |